RUSSELL CORPORATION, formerly known as Monitor Publications, Inc.

v.

The UNITED STATES.

No. 64–73.

United States Court of Claims.

July 9, 1976.

O. P. Easterwood, Jr., Washington, D. C., atty. of record, and Conrad Philos, Vienna, Va., for plaintiff. Lansford F. Butler, Lakewood, Colo., of counsel.

Floyd France, Washington, D. C., with whom was Asst. Atty. Gen., Peter R. Taft, Washington, D. C., for defendant. Herbert Pittle, Washington, D. C., of counsel.

Before NICHOLS, KASHIWA and BEN-NETT, Judges.

## OPINION

PER CURIAM:

This case comes before the court on plaintiff's exceptions to the recommended decision of Trial Judge Kenneth R. Harkins, filed December 9, 1975, pursuant to Rule 134(h), having been submitted to the court on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, as hereinafter set forth,* it hereby affirms and adopts the same as the basis for its decision in this case. It is therefore

concluded that plaintiff is not entitled to recover and the petition is dismissed.

## OPINION OF TRIAL JUDGE

HARKINS, Trial Judge:

Plaintiff claims representatives of the General Services Administration (GSA) in 1969–70 negotiated a contract to exchange plaintiff's property, lots 2 through 10, block 111, East Denver, Colorado, for 120 acres, in two tracts, of former Federal Correctional Institute property located in Jefferson County, Colorado, and seeks breach damages for defendant's refusal to go forward and transfer the properties. In the exchange, plaintiff would have conveyed real estate with an appraised fair market value of $405,000, and $15,000 in cash, for Government property with a fair market value of $420,000 when appraised on the basis of then current zoning, and a value of $720,000 if the area were zoned for high-density-occupancy usage. Defendant concedes that the proposed agreed price was $300,000 less than the actual fair market value of the Government land at the time in question.

Discussions relative to the exchange agreement commenced on June 28, 1968, when plaintiff was notified that GSA's regional office (region 8) had agreed with the Denver Urban Renewal Authority (DURA) that the entire block 111 would be acquired by GSA in connection with its plans for the Denver Federal building complex. Plaintiff's first formal offer, with a $1,000 earnest money deposit, was submitted on December 26, 1968. Subsequently, on February 24, 1969, the GSA administrator authorized the regional administrator to initiate negotiations for an exchange; by June 6, 1969, an independent contract appraiser had reported on both parties' properties; and, on July 29, 1969, plaintiff submitted its final firm offer on forms prepared by, and in terms acceptable to, GSA's regional representatives. Thereafter, the GSA administrator approved the exchange and, on De-

---

* Whereas the court adopts the trial judge's separate findings of fact, which are set forth in his report filed December 9, 1975, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

cember 8, 1969, requested the Budget Bureau director to approve transfer of the property from the Department of Justice to GSA, which approval was granted on January 16, 1970. The regional office, on February 19, 1970, was authorized to conclude the exchange after obtaining updated appraisals. Updated appraisals, unchanged from the original appraisals, were submitted by March 23, 1970. At this stage, GSA's regional office, on April 6, 1970, decided not to go forward with the exchange because the regional personnel were fearful they would be subjected to criticism in the event proposed changes in Denver zoning ordinances would permit high-density usage that had not been considered in the independent appraiser's reports. Finally, on April 29, 1970, GSA's central office advised the regional office that the value estimates in the updated appraisals, and the investigation of local zoning on which they were based, were approved.

Plaintiff contends that, under GSA regulations, the regional representatives had agreed upon the terms of the exchange and that this agreement became binding and enforceable when the mechanical formalities of subsequent administrative actions and approvals had been concluded. The issue is whether, under the statute and GSA's regulations applicable to exchanges of real property, GSA representatives in region 8 had the power to change their negotiating posture during the period when administrative formalities remained to be concluded, but which were ultimately concluded in the manner the parties originally had contemplated.

For the reasons set forth, GSA's regional representatives acted within their powers and no contract came into existence.

GSA's authority to enter into an exchange agreement with plaintiff is derived from the Federal Property and Administrative Services Act of 1949.[1] The GSA administrator is authorized to supervise and direct disposition of surplus property and utilization within the Government of excess property that is not required for the needs of a particular Federal agency.[2] In the exercise of his responsibilities for the operation and maintenance of governmental buildings, properties, and grounds, the GSA administrator can acquire by purchase, condemnation, or otherwise, real estate and interests therein.[3] The GSA administrator is authorized to promulgate such regulations as he deems necessary to effectuate his functions under the act,[4] and may delegate and authorize successive redelegations to any official of the General Services Administration.[5]

The powers conferred in the Federal Property and Administrative Services Act of 1949 have been implemented by the Federal Property Management Regulation.[6] Transfers of property that is excess to the needs of a particular agency in the executive branch to the GSA for use by another agency or for disposal are regulated by subsection 101–47.203–7. This section prescribes the use of GSA Form 1334 [7] and requires approval of the Bureau of the Budget (now Office of Management and Budget) in transfers that involve properties having an appraised fair market value of

1. 63 Stat. 378, 40 U.S.C. §§ 471 *et seq.* (1970).

2. 40 U.S.C. §§ 472(e), (g) and 484(a)–(b) (1970).

3. 40 U.S.C. § 490(a)(12) (1970).

4. 40 U.S.C. § 486(c) (1970).

5. 40 U.S.C. § 486(d) (1970).

6. 41 C.F.R. Part 101–47, Utilization and Disposal of Real Property.

7. GSA Form 1334, entitled "Request for Transfer of Excess Real Property and Related Personal Property," provides relevant identifying information with respect to the property to be transferred, a detailed statement of justification for the proposed use of the property after the transfer, and a certification by the responsible GSA official that the property identified and the transfer thereof would be in accord with an approved program and consistent with the policy guidelines established by the Bureau of the Budget. In this case, the certification was signed by the regional administrator, region 8.

$100,000 or more.[8] Budge Bureau approval is required for transfers of real property between Government agencies; BOB approval of the terms of exchange contracts between GSA and outsiders is not required.

The essence of plaintiff's case is found in the relationship between GSA's regional offices and the Washington central office in procedures for dealing with parties outside the Federal Government. GSA functions at three levels of organization—the central office, located in Washington; 10 regional offices; and special field activities. Supporting staff functions are in the central office; operations are administered largely by regional and field offices. The regional offices, headed by regional administrators (formerly regional commissioners) are completely integrated and parallel the organizational pattern of the central office. General operating authority for supervision of GSA programs in a particular region has been granted to the regional administrator, under comprehensive delegations of authority, so that the regional administrators are the active and fully empowered heads, with the usual managerial responsibilities, in their respective offices.[9]

The Public Building Service (PBS) is responsible for design, building or leasing, operation, protection, and maintenance of Federal buildings.[10] When plaintiff's exchange agreement was negotiated, GSA personnel in the Property Management and Disposal Service (PMDS) and in PBS had responsibility for exchanges of real property. PBS was responsible for the type of exchange involved with plaintiff; but personnel from both services—in region 8 and

in the central office—were active on plaintiff's exchange agreement.

In the central office, GSA officials concerned with plaintiff's contract were the GSA administrator, PBS commissioner, PMDS commissioner, and PMDS appraisal staff director; in region 8, the officials were the regional administrator, PBS regional director, PMDS regional director, and PMDS appraisal staff chief. The PBS regional director was responsible for development and negotiation of the exchange agreement.[11]

Internal GSA procedures applicable to the exchange of real property in this case are provided in two regulations: GSA Order ADM 7800.6, "Exchange of Government-owned real property" (Oct. 10, 1968), and a PMDS All Regions Memorandum, dated September 4, 1969, entitled "Exchange of Surplus Real Property."[12] ADM 7800.6 is the basic order for exchanges of real property. As in the case of procedures for acquisition or disposition of realty in most corporate or large organizations, it is complex and its structure reflects the special character of land transactions. The attachment to ADM 7800.6 requires several stages of consideration and approvals at the highest levels of GSA's hierarchy.

ADM 7800.6 divides realty exchanges by type between PMDS and PBS, and provides that PBS shall be responsible for real property exchange transactions for the acquisition of property for an "authorized GSA program use," which includes the acquisition of real property for parking, motor vehicle facilities, and other facilities for

8. 41 C.F.R. § 101–47.203–7(c).

9. United States Government Organization Manual 1975/1976, 510–13. Delegation of the Administrator, 23 Fed.Reg. 5726 (July 30, 1958); 24 Fed.Reg. 10681 (Dec. 24, 1959); 32 Fed.Reg. 9585 (July 1, 1967); and 34 Fed.Reg. 9633 (June 19, 1969). *Monahan v. United States*, 354 F.2d 306, 309, 173 Ct.Cl. 734, 738 (1965).

10. PBS was established on December 11, 1949, pursuant to the authority contained in the Federal Property and Administrative Services Act.

PMDS was established on July 29, 1966. By 1973, PBS had absorbed some PMDS functions and was responsible for the disposal of real property and related personal property. 38 Fed.Reg. 32292 (Nov. 29, 1973).

11. The names and titles of the specific individuals involved are set forth in the detailed findings of fact.

12. The memorandum was addressed: "All Regional Administrators, ATTN: All Regional Directors (PMDS)."

which PBS is responsible.[13] Where excess property of another Government agency is involved in a PBS exchange, the regulation provides that custody and control of the property "shall be transferred by PMDS to PBS, prior to initiation of the exchange transaction." [14]

The attachment to ADM 7800.6 recites that the economic magnitude, complexities, and statutory involvements in an exchange program require a high degree of coordination by the PBS and PMDS and free exchange of information at both the central office and regional levels.

The importance of agreements to exchange land is underscored by the prominent role played by the GSA administrator in the procedures. Section 5 of ADM 7800.-6, with five subsections, is devoted to steps in the sequence that require his approval. Approval of the GSA administrator is required before any proposed exchange is initiated, and independent appraisals are not to be obtained on properties in the PBS inventory that are eligible for consideration in an exchange prior to approval of the plan by the administrator. Although GSA personnel may make preliminary evaluations of property to be acquired in potential exchange transactions, contract appraisals by independent outside appraisers "shall not be obtained on properties to be acquired nor shall negotiations be initiated prior to approval of the exchange plan by the Administrator." [15] During discussions with property owners needed to develop an exchange plan for submission, ADM 7800.6 directs that the property owners "be advised that such discussions are of a preliminary nature only and cannot be considered in any way as being a commitment until the proposed exchange has been approved by the Administrator." [16] When the GSA administrator has approved initiation of the plan, the procedures require the region to obtain necessary appraisals and to arrange for PMDS to transfer to PBS excess property from other agencies prior to proceeding further with the exchange.[17]

The region's authority to negotiate a final exchange agreement must follow review and approval of the contract appraisals, and, when the negotiations produce an acceptable exchange agreement, the region must submit a detailed report "to the appropriate commissioner for review and recommendation to the Administrator." [18]

In addition to required action by the GSA administrator, other actions by the central office further limit the regional administrator's authority in exchange procedures. The regional administrator must submit a proposed plan to the appropriate PBS or PMDS commissioner for review, approval, and recommendation to the administrator before the exchange is initiated. During subsequent negotiations, the regional administrator must obtain approval at the commissioner level before third parties may

---

13. GSA Order ADM 7800.6 § 4a(3).

14. GSA Order ADM 7800.6 § 4b reads:

"b. In instances where PBS identifies excess property desired for use in exchange transactions under a, above, subject to a determination by PMDS that the property is available for the proposed use, custody and control over the property shall be transferred by PMDS to PBS, prior to initiation of the exchange transaction, after compliance with section 202(a) of the Federal Property and Administrative Services Act of 1949, 63 Stat. 384, as amended (40 U.S.C. § 483(a)), as implemented by FPMR 101–47.203–7, including clearance with the Bureau of the Budget, if required."

15. GSA Order ADM 7800.6, Attachment ¶ 5b.

16. GSA Order ADM 7800.6, Attachment ¶ 5c.

17. GSA Order ADM 7800.6, Attachment ¶ 5d. When excess properties are to be transferred to PBS for an exchange, prior to submission of the final GSA Form 1334, PBS must secure the GSA administrator's approval on the exchange plan. GSA order ADM 7800.6, Attachment ¶ 6b.

18. The text of paragraph 5e of the attachment to GSA Order ADM 7800.6 is:

"e. Following approval of the appraisals, active negotiations shall be undertaken to accomplish the exchange. When negotiations have progressed to the point where the exchange is acceptable, a detailed report shall be submitted to the appropriate Commissioner for review and recommendation to the Administrator."

be involved [19] or before concluding a negotiation where the acquired property is not "at least 100 percent of the approved appraised fair market value of the property offered for the exchange." [20]

The regional administrators were further restricted by directions for appraisals of Government property by the September 4, 1969, PMDS All Regions Memorandum. This memorandum requires that appraisals to determine the fair market value of the Government property to be exchanged must reflect possible changes in local zoning regulations. The appraiser must give weight to "proposed local zoning covering that property," and, where possible, the proposed zoning "should be confirmed in writing by the zoning authority." Appraisals should reflect not only current zoning, but should include comments as to whether the zoning is in accord with the highest and best use of the property; the possibility of future changes in zoning and an evaluation of the effect of any change should be discussed. If the value estimate based on indicated local zoning varies with a value estimate based on the highest and best use by more than 10 percent, the appraiser is to furnish the additional value estimate separately.

After the exchange is completed, zoning changes are required to be reported to the central office. The memorandum states:

Also, the Regional Director shall be responsible for informing the Central Office of any increase in value of the property due to rezoning or any other developments at any time before the explanatory statement is submitted to the Congressional Committees on Government Operations.

In this case, there is no dispute that there was compliance with the procedures required by regulation in the numerous stages of development and negotiation that transpired through the time plaintiff's offer was put in final form, in terms then acceptable to the regional office, and forwarded on August 5, 1969, to the central office with a recommendation for approval. There is a dispute, however, whether, under the regulation, the GSA administrator approved plaintiff's final offer. Plaintiff contends express direct approval of the GSA administrator is not necessary under the regulation for a valid and binding contract to come into existence, but, in any event, in this case, such approval in fact was given. Defendant insists that the GSA administrator's approval never was given as required by ADM 7800.6, Attachment ¶ 5e, to a final agreement and that negotiations for the exchange could not result in a contract, express or implied, in the absence of such final express approval.

There is no question that the GSA administrator had to approve the exchange after it had been negotiated to the point where it was "acceptable." The regulation is silent, however, as to how the approval is to be communicated to the regional administrator or when the negotiation stage has been completed at the regional level.

The GSA administrator was involved and had given his approval in many stages in the development of this exchange. The administrator, during a visit to Denver on June 4, 1968, had given approval orally to the acquisition of block 111 in a conversation with the regional administrator, and had given written authority to initiate the exchange on February 24, 1969.

Plaintiff's offer in final form was delivered on July 29, 1969. The regional administrator forwarded it on August 5, 1969, to the PBS commissioner for approval, together with GSA Form 1334, with its attached

19. GSA Order ADM 7800.6, Attachment ¶ 8a.

20. GSA Order ADM 7800.6, Attachment ¶ 8b is:

"b. *Vigorous negotiations required.* All exchange negotiations shall be conducted vigorously to obtain, in return for the Government's property, other property of equal or higher value or other property plus cash, taking into consideration where justified the unusual or unique need for the property to be acquired. No exchange negotiation shall be concluded without approval of the Commissioner, PBS, or Commissioner, PMDS, as appropriate, unless the value of the property to be acquired is at least 100 percent of the approved appraised fair market value of the property offered for the exchange."

statement of justification that explained the exchange transaction in detail. Since this exchange involved property that had to be transferred from the Department of Justice to GSA, the GSA administrator had to request the approval of the Budget Bureau director. On October 10, 1969, the PMDS commissioner and the PBS assistant commissioner jointly recommended that the GSA administrator act to obtain this approval. The joint memorandum advised the GSA administrator that, prior to completion of the exchange, the region would review the appraisals in accordance with the September 4, 1969, All Regions Memorandum to ascertain that there had been no significant change in the proposed zoning of the Government-owned land or in the value of the property, and that, upon approval of the BOB director, "the Regional Administrator in Denver will be authorized by this office to conclude the exchange in accordance with GSA Order ADM 7800.6, paragraph 4a(3)."

On December 8, 1969, the GSA administrator took the required action to obtain the approval of the BOB director by forwarding the final GSA Form 1334 with its explanatory justification. Budget Bureau approval was granted on January 16, 1970, for the transfer of the property from the Department of Justice to GSA and, on February 2, 1970, the property was transferred.

 In this case, the requirement of ADM 7800.6, Attachment ¶ 5e, that the GSA administrator approve the exchange after conclusion of negotiations is satisfied by his request to BOB to approve GSA Form 1334. To make such request, the GSA administrator necessarily had to approve plaintiff's offer for the exchange. In the absence of a failure in any of the other steps that remained to be taken, there would have been compliance with the requirements of the regulation and the exchange could have been concluded without further action by the GSA administrator. The procedures permit notice to be given to the region of the GSA administrator's approval by the PBS and PMDS commissioners; further steps in the exchange then

may be completed by the commissioners or by regional officials.

A direct communication from the GSA administrator to the region signifying his approval is not required by ADM 7800.6. It was not customary agency practice for the GSA administrator to sign the exchange plan documents that had originated in the region. The version of Exchange Plan No. 3 (Revised) that the GSA administrator approved, although the form had blanks for concurrence by the PBS commissioner and approval by the GSA administrator, did not go forward and was not signed by the GSA administrator. Plaintiff's final offer, on a Government form, provided for the regional administrator to accept on behalf of the United States.

Although the GSA administrator expressly approved the exchange that had been negotiated by the region, this approval was qualified. At this stage in the procedure, all parties knew additional actions had to be completed. Plaintiff's offer was not accepted by the approval that the GSA administrator granted on December 8, 1969.

 Plaintiff contends that a valid and binding contract, express or implied in fact, sprang into existence on the facts of this case either on February 19, 1970 (when the PBS commissioner authorized the regional administrator to conclude the exchange), or on April 29, 1970 (when the PMDS appraisal staff director notified the PMDS regional director that the updated contract appraisals were approved and that the higher estimate of the PMDS appraisal staff chief was rejected). For there to be an express contract, the parties must have intended to be bound and must have expressed their intention in a manner capable of understanding. A definite offer and an unconditional acceptance must be established. Here, the contract documents that would manifest the offer and acceptance were not executed by any representative of the Government. Further, the regional officers authorized to act for the Government in dealing with the plaintiff changed their minds and withdrew their previously granted assent prior to the time the documents were to be executed.

In these circumstances, no express agreement could come into existence.

Under the GSA regulations, authority to make an exchange agreement that would bind the Government was not located in one Government representative. The regional administrator had overall responsibility for operations in region 8 and was the official designated to execute contractual documents on behalf of GSA in matters that affected the region. The contracting officer for region 8 was the regional administrator and plaintiff's agreement could not be concluded without his assent. PBS, however, had responsibility over an exchange of GSA property for the acquisition of plaintiff's property for parking facilities. The agreement for such an exchange is generated at the regional level, with the PBS regional director responsible for preliminary discussions prior to the grant of authority to initiate negotiations, and for subsequent negotiations that would produce an acceptable agreement. Neither the PBS regional director nor the PBS commissioner had authority to make a contract with plaintiff. Throughout the negotiations, plaintiff was cognizant of the limitation on the authority of the regional officials and recognized the interrelatedness of the various approval actions required by the regulations.

■ A contract implied in fact requires a showing of the same mutual intent to contract as that required for an express contract. The fact that an instrument was not executed is not essential to consummation of the agreement.[21] It is essential, however, that the acceptance of the offer be manifested by conduct that indicates assent to the proposed bargain.[22] The requirements of mutuality of intent and the lack of ambiguity in offer and acceptance are the same for an implied-in-fact contract as for an express contract; only the nature of the evidence differs.[23]

■ Implied-in-fact contracts differ from contracts implied in law (quasi-contracts), where a duty is imposed by operation of law without regard to the intent of the parties. Such arrangements are treated as contracts for the purposes of remedy only. This court, of course, has no jurisdiction to render judgment against the United States based upon a contract implied in law.[24]

■ The regional administrator withdrew his assent to plaintiff's offer and refused to execute the contract on April 6, 1970, after the top-level regional staff meeting. Up to that time, all participants to the exchange, including plaintiff's president, knew that additional actions under the regulations remained to be completed before a contract could come into existence. A contract could not have come into being prior to the April 6, 1970, meeting.

On February 19, 1970, the PBS deputy commissioner authorized the regional administrator to conclude the exchange. This authority was expressly qualified. The exchange was not to be completed until (1) updated appraisals on both properties were obtained; (2) such updated appraisals included consideration of possible changes in zoning regulations as required by the September 4, 1969, All Regions Memorandum; and (3) the regional administrator after consideration of the updated appraisals had advised the central office of his proposed actions and of any unusual circumstances in the matter. Before the updated appraisals were obtained and analyzed, plaintiff's president was told about the regional administrator's qualified authorization and plaintiff's president recognized that such

21. *United States v. Purcell Envelope Co.*, 249 U.S. 313, 319, 39 S.Ct. 300, 63 L.Ed. 620 (1919); *Penn-Ohio Steel Corp. v. United States*, 354 F.2d 254, 267, 173 Ct.Cl. 1064, 1085 (1965).

22. *Thomson v. United States*, 357 F.2d 683, 689, 174 Ct.Cl. 780, 791 (1966); *Penn-Ohio Steel Corp. v. United States, supra* note 21, 354 F.2d at 267, 173 Ct.Cl. at 1086.

23. *Algonac Mfg. Co. v. United States*, 428 F.2d 1241, 1255, 192 Ct.Cl. 649, 674 (1970).

24. *Putnam Mills Corp. v. United States*, 479 F.2d 1334, 1337, 202 Ct.Cl. 1, 8 (1973); *Algonac Mfg. Co. v. United States, supra*, note 23, 428 F.2d at 1256, 192 Ct.Cl. at 674.

actions would have to be completed before the contract could bind the Government. In a telephone conversation on March 26, 1970, with the PBS regional director, plaintiff's president expressed disappointment but did not disagree that the Government could defer final action until April 6, 1970.

Updated contract appraisals for the Monitor property, dated March 4, 1970, and for the Government property, dated March 20, 1970, did not change the values previously given; the Monitor property was appraised at $405,000 and the Government property at $420,000. The updated appraisals, however, did not comply with requirements of the September 4, 1969, All Regions Memorandum. They were made on the basis of existing zoning restrictions and did not include valuations for rezoning for the highest and best use. Both updated contract appraisals ultimately were approved in the regional office and in the central office. The Government property appraisal was approved in the region by the PMDS appraisal staff chief on March 31, 1970, and in the central office by the PMDS appraisal staff director on April 29, 1970. By the time the central office approved the updated appraisal, the regional administrator had rejected plaintiff's offer.

After the updated contract appraisals were submitted, the PBS regional director requested the PMDS appraisal staff chief to obtain, by no later than April 6, 1970, the contract appraiser's value of the Government property in the event the adjacent properties were to be rezoned for high-density occupancy. The PMDS appraisal staff chief was unable to obtain this value from the contract appraiser and instead, on March 27, 1970 (4 days before he approved the contract appraisal for the Government property), in a memorandum to the PBS regional director, he submitted his own estimate that the Government property would have a value of $720,000 if the adjacent land were to be rezoned for the highest and best use.

During the period this exchange was being negotiated, the Jefferson County School Board became interested in the 80-acre tract of the Government land for use as a service center. A comprehensive account, including a map, was published in the Denver newspapers. In addition, both the regional office and the central office had been concerned about repetition of a situation that had developed with respect to GSA exchanges in the period 1966–67 of property at the Lowry Air Force Base. Reason for this concern was underscored on April 5, 1970, by an article in the Denver Post on the Lowry Air Force Base exchanges. This article contended that the GSA had traded Lowry Air Force Base land, estimated to have a value of $4,000,000, for cash and property estimated to have a value of approximately $680,000. The purport of the article was that, after the exchanges had been made, zoning changes to permit high-density occupancy increased the value of the former Government property and permitted the non-Government participants in the exchange to reap exorbitant profits.

On April 6, 1970, the regional administrator met with the PBS regional director, the PBS Space Management Division chief, the PMDS regional director, and the PMDS appraisal staff chief to consider plaintiff's offer. At this meeting, the regional officials determined, because of the possible similarity to the Lowry Air Force Base situation and the possibility of similar unfavorable publicity, that the Government should not go forward with the exchange.

At the time, on April 6, 1970, when the decision was made not to go forward with the exchange on the basis of plaintiff's offer, no implied-in-fact contract was in existence. Although the GSA administrator had approved the terms contained in plaintiff's offer, and the PBS deputy commissioner had authorized the exchange to be concluded, all parties understood and agreed that the exchange would not be completed until there had been compliance with the applicable regulations.

 Responsibility of the regional administrator for general supervision of regional affairs would include authority to reject plaintiff's offer on the basis of information available to him on April 6, 1970.

The regional administrator would have this authority notwithstanding there had not been strict compliance with GSA regulations in the development of such information. The $720,000 estimated value of the Government property was not the product of a formal appraisal by the PMDS appraisal staff chief; nor was his estimate in compliance with GSA practice that, in real estate exchanges, appraisals would be made by independent contract appraisers. The PMDS appraisal staff chief's estimate, however, was in response to an official request for information from PBS on possible rezoning effects, was based on consultations with officials of the Planning and Zoning Board of the county, and was made by a knowledgeable and qualified expert on land values. It was a reasonable basis for the regional administrator's action to reject plaintiff's offer in the light of the fact that the updated appraisals from the contract appraiser did not comply with the requirements of the September 4, 1969, All Regions Memorandum.

On April 29, 1970, the PMDS appraisal staff director in the central office notified the PMDS regional director that the updated appraisal by the contract appraiser on the Government property had been reviewed and was approved. The central office was satisfied that the contract appraiser had made a sufficient investigation to justify the decision concerning the proper zoning on which to base the reaffirmed value estimates. In addition, the PMDS appraisal staff director advised that the March 27, 1970, estimate of $720,000 by the PMDS appraisal staff chief was no more reliable, if as reliable, as the value certified by the contract appraiser.

■ Both the regional and central office PMDS appraisal staffs approved the contract appraiser's updated valuations. Both agree that such valuations are accurate on the basis of then current zoning. The PMDS appraisal staff director did not find in his April 29, 1970, memorandum that there was compliance with the standards of the September 4, 1969, All Regions Memorandum, and his rejection of the regional appraisal chief's estimate does not countermand, purge, or supersede the April 6, 1970, action of the regional administrator.

No actions were taken by representatives of the defendant at the regional level after April 6, 1970, that manifest an intent to accept plaintiff's offer. Even if it is assumed that the approvals and other actions required to be taken prior to April 6, 1970, were mere formalities, as plaintiff contends, after that date plaintiff's president knew that the offer had been rejected. He asked for a return of his deposit, and refused to negotiate a new offer on the basis of the higher valuation of the Government property. After April 6, 1970, notwithstanding the subsequent approval on April 29, 1970, of the updated appraisals and the rejection of the PMDS appraisal staff chief's estimate, neither plaintiff's president nor the regional officials took actions that manifest an intent to enter into a contract on the basis contained in plaintiff's July 29, 1969, offer.

■ Plaintiff also contends that equity and fair dealing require the Government be estopped from repudiating its obligations on the facts of this case. The doctrine of equitable estoppel will be applied by this court in an appropriate case to prevent the United States from denying the existence of a contractual agreement.[25] For the doctrine of equitable estoppel to be applied, however, the facts must show the following elements to be present: (1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.[26]

25. *Manloading & Management Associates, Inc. v. United States*, 461 F.2d 1299, 198 Ct.Cl. 628 (1972); *Branch Banking & Trust Co. v. United States*, 98 F.Supp. 757, 120 Ct.Cl. 72, *cert. denied*, 342 U.S. 893, 72 S.Ct. 200, 96 L.Ed. 669 (1951).

26. *Emeco Indus., Inc. v. United States*, 485 F.2d 652, 657, 202 Ct.Cl. 1006, 1015 (1973); *United States v. Georgia Pac. Co.*, 421 F.2d 92, 96 (9th Cir. 1970).

On the facts, there is no basis for application of the doctrine of equitable estoppel; none of the requisite elements are present. The regional administrator and the PBS regional director did not know that the value of the Government property exceeded the value of plaintiff's property by more than $300,000 in their negotiations with plaintiff's president or when they recommended approval of plaintiff's offer. After this disparity came to light, they did not engage in a course of conduct that misled plaintiff's president into a belief that his offer would, or even could, be approved.

Throughout the negotiations, both parties recognized that the regulations required the properties to be exchanged to have equivalent values, and that appraisals and updated appraisals would have to be obtained and approved. Such damage as plaintiff may have suffered does not result from reliance on the conduct or misrepresentation of the GSA officials concerned with the exchange.

Examination of the effects on plaintiff resulting from the refusal to go forward with the exchange does not show plaintiff to have the type of equities that are protected by the doctrine of equitable estoppel. Plaintiff had $1,000 in earnest money on deposit for more than a year, and alternative ways of disposing of the Monitor property might have been pursued during this period. Plaintiff's president, however, was experienced in real estate transactions and knowledgeable about the time that would be needed to process the offer. Plaintiff's deposit was returned promptly after it was recognized that the deal could not go forward.

Plaintiff has lost the opportunity to trade property and cash worth $420,000 for property that now is conceded to have been worth, at that time, $720,000. Plaintiff has lost a good piece of business, but plaintiff has not changed its position in reliance on the conduct of defendant's representatives.

Plaintiff has lost the consummation of a beneficial business transaction which, if it had been operating in private markets and had not been doing business with the Government, might have been concluded more expeditiously in the manner plaintiff sought. Plaintiff, however, was cognizant of the limitations imposed on the GSA personnel by regulation, and chose to enter the transaction and to make an offer subject to those restrictions. Limitations in the GSA regulations were devised for the specific purpose of protecting the Government from precipitous actions that might lead to unwise bargains. Their goal is to prevent actions that subsequently could subject the Government participants to criticism that the public's property had been inadequately protected.

Inasmuch as no contract was made and defendant has no obligation to pay damages for breach, it is not necessary to determine whether plaintiff would be entitled to any more than the $300,000 difference between the contract price and the actual fair market value of the Government's property at the time of the breach.

## CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and the petition is dismissed.