**PREVADO VILLAGE PARTNERSHIP** Composed of Twenty-Fifth Avenue Health Services, Inc., An Alabama Corporation; and J. Christopher Enterprises, Inc., an Ohio Corporation

v.

**The UNITED STATES.**

No. 156–82C.

United States Claims Court.

Aug. 22, 1983.

Elizabeth R. Rindskopf, Washington, D.C., for plaintiffs. Robert B. Wallace, Surrey & Morse, Washington, D.C., of counsel.

M. Susan Burnett, Washington, D.C., with whom was Asst. Atty. Gen., J. Paul McGrath, Washington, D.C., for defendant. Lorraine B. Halloway, Richard W. Oehler, Dept. of Justice, and James E. Blackmon, U.S. Dept. of Housing and Urban Development, Washington, D.C., of counsel.

## OPINION

LYDON, Judge:

In its complaint, plaintiff, a partnership, seeks damages for breach by defendant, acting through the Department of Housing and Urban Development (HUD), of an alleged implied-in-fact agreement to award plaintiff a construction contract under the Section 8 New Construction Program, which began as part of the 1974 general revision of the Housing Act of 1937, 42 U.S.C. § 1437f (1976). Plaintiff further claims that HUD violated its own regulations, which not only constituted a breach of this implied-in-fact contract, but also resulted in a violation of plaintiff's Fifth Amendment rights to due process of law. Defendant has moved for summary judgment on the matter. Plaintiff opposes said motion and has filed a cross-motion for summary judgment. Both parties maintain there is no genuine issue of material fact. After oral argument and consideration of the positions and submissions of the parties, it is concluded that defendant's motion for summary judgment should be granted.

### I.

The Section 8 New Construction Program (Section 8 program) was designed to aid lower-income families in obtaining a decent place to live and to promote economically mixed housing by providing financial subsidies to promote developers. 42 U.S.C. § 1437f(a) (1976).

The Section 8 program, as implemented by appropriate regulations, consists of an application-review-negotiation process which may or may not culminate in a construction contract between a developer and HUD. Following a notice that funds are available for construction, 24 C.F.R. § 880.-

203 (1979), one or more "Preliminary Proposals" are submitted to HUD by interested developers describing pertinent features of their proposed construction, such as proposed location, title to property, size, intended rent by unit, and type of financing. *Id.* at § 880.205. After evaluating Preliminary Proposals on the basis of various factors, *id.* at § 880.208(e)(3), a HUD field office may approve one or more of the Proposals. *Id.* at § 880.208(e)(6). The developer is notified of its selection and advised of the various requirements and special conditions which must be met, *e.g.*, acceptable contract rental rates. *Id.* at § 880.208(h). A developer may seek reconsideration of any HUD modification. *Id.* at § 880.208(h). An approved developer is then requested to submit a "Final Proposal" meeting the requirements of § 880.209. The required contents of a "Final Proposal," though similar to the required contents of a Preliminary Proposal,[1] are nonetheless different in that the requirements for a Final Proposal may be more extensive and particular in certain respects. *See e.g., id.* at § 880.209(2), (7), (10), (11), and (14).

After evaluating a Final Proposal, HUD notifies the interested developer whether its Final Proposal was approved, conditionally approved, or not approved. Each Final Proposal is then reviewed by HUD for technical feasibility and soundness. 24 C.F.R. §§ 880.209, 880.210 (1979). Upon a developer's acceptance of the notification of approval of the Final Proposal, the developer must submit to HUD an architect's certification in the prescribed form "[b]efore an Agreement may be entered into * * * " by the parties. *Id.* at § 880.211(b). Finally, following receipt of the developer's accepted notification, the architect's certification and the working drawings and specifications, the HUD field office prepares the project "Agreement", for execution. *Id.* at § 880.214. It is at this stage that a binding express construction contract between the

parties comes into being. Thereafter, actual construction begins.

In this case, the HUD Birmingham Area Office (Area Office) on or about July 28, 1978, issued a notice, in a newspaper of general circulation, that invited Preliminary Proposals for construction of 125 units of elderly housing to be built under HUD's Section 8 program in Birmingham, Alabama. Plaintiff, one of 21 developers who responded to this notice, submitted its Preliminary Proposal on August 28, 1978. Upon review of plaintiff's submission, the Area Office notified plaintiff on September 27, 1978 that its Preliminary Proposal had been approved. The Area Office advised plaintiff, *inter alia,* that:

> Subject to the fulfillment of all administrative and statutory requirements, an Agreement to Enter Into Housing Assistant Payments contract will be prepared and executed for the number and size of units described below * * *.

The letter of September 27, 1978, also informed plaintiff that contract rental rates acceptable to HUD were lower than those proposed by plaintiff, and that the maximum HUD mortgage insurance was $2,805,000, substantially less than the $3,616,000 of HUD insurance which plaintiff sought in its Preliminary Proposal. Furthermore, the letter listed additional special conditions or requirements to be met.

By letter dated October 6, 1978, plaintiff conditionally accepted HUD's approval of its Preliminary Proposal. Plaintiff's approval was conditional because of the difference between HUD's maximum amount of mortgage insurance and plaintiff's requested amount. The October 6th letter also indicated that the parties' differences in mortgage projections were the result of differences in annual operating expense projections. The operating expense projections were generally stated as anticipated

---

1. 24 C.F.R. § 880.209(b) required that the Final Proposal be consistent with the HUD-approved Preliminary Proposal. This consistency requirement did not mean that the Final Proposal must be identical in every single detail with the Preliminary Proposal. It did mean, however, that the basic features of the Preliminary Proposal, *e.g.,* location, title to property, general structure features, etc. should not be alien to the Final Proposal.

costs per unit (*e.g.* 1 bedroom) per annum (PUPA).

Subsequent to notifying plaintiff of approval of its Preliminary Proposal, one of the 21 firms that had submitted a Preliminary Proposal appealed the Area Office's approval of plaintiff's proposal to HUD's Central Office in Washington, D.C. On or about November 23, 1978, plaintiff was informed by letter of the pending appeal and advised not to incur additional costs on the project until further notice since no further action would be taken on its proposal until the appeal was resolved. Nevertheless, on December 7, 1978, plaintiff submitted a "Firm Application" to the Area Office. On March 18, 1979, the Area Office informed plaintiff by letter that it would begin processing and screening the Final Proposal and Firm Application and would advise plaintiff if any additional information would be needed. On April 20, 1979, HUD ruled that the Area Manager's approval of plaintiff's Preliminary Proposal was proper and would not be rescinded.

Between May 1, 1979 and September 11, 1979, plaintiff and HUD officials from the Area Office engaged in negotiations in an effort to reach agreement on an acceptable Final Proposal. On May 1, 1979, plaintiff submitted its Application for Project Mortgage Insurance (Form 2013), which was to be reviewed as the financing portion of the Final Proposal, again requesting a HUD insured mortgage of $3,616,800. Plaintiff submitted a revised mortgage application form on May 10, 1979, requesting a mortgage amount of $3,851,000. On May 14, 1979, the HUD Area Office informed plaintiff by letter that its Final Proposal was not acceptable for processing for numerous reasons. The letter specifically listed over 20 deficiencies in the proposal that required completion. Plaintiff responded to these requests on May 21, 1979.

Throughout the summer of 1979, the parties also negotiated other aspects of the project upon which agreement was necessary before a Final Proposal could be accepted by HUD. On July 11, HUD advised plaintiff that the maximum allowable rents

(1 bedroom unit—$353, per month and 2 bedroom unit—$414 per month) were lower than those proposed by plaintiff. Plaintiff responded on July 18, purporting to accept the maximum rents stated by HUD.

Toward the end of July 1979, HUD received a valuation report which analyzed comparable projects in the same area and concluded, on the basis of this report, that a per unit per annum (PUPA) operating expenses figure of $1,450 was the minimum amount with which the project could properly function. HUD thereafter advised plaintiff of this minimum figure. Plaintiff, however, contended then, as it does now, that this figure was unreasonable.

Also in July 1979, plaintiff requested, and defendant approved, on or about July 18, 1979, an increase in the number of construction units from 125 to 132. At the same time HUD required revisions in plaintiff's proposed heating and cooling system.

Plaintiff thereafter submitted a revised HUD Form 2013 on August 22, 1979 wherein it increased its PUPA figure from $1,300 to $1,375, while also increasing the previously-agreed rental level from $353 to $373 for a 1 bedroom unit and from $414 to $436 for a 2 bedroom unit. On August 28, 1979, HUD informed plaintiff that its August 22 Final Proposal was unacceptable because of the request for rental increases over and above those previously agreed to on July 18, 1979 and because of the variance between the number of construction units set forth in the application form and those covered in the plans and specifications submitted by plaintiff. In this letter, HUD informed plaintiff that it should submit a final and complete application within 10 days.

On August 30, 1979, plaintiff submitted a revised Form 2013 which included rental levels, acceptable to HUD, *i.e.*, $353 for a 1 bedroom unit and $414 for a 2 bedroom unit, but which also included a PUPA figure of $1,200, $250 less than the previously announced minimum of $1,450. By letter dated September 6, 1979 plaintiff increased its PUPA figure to $1,300, $150 less than the $1,450 minimum and, as in the August

30 submission, included acceptable rental levels.

On September 12, 1979, HUD sent plaintiff the following letter:

Over the past several months, this office has worked closely with you to process the subject proposal. In this effort, we have considered many revised proposals (Form FHA 2013). Also, we have given favorable consideration to your request for design changes to enhance the proposal's economic feasibility. Unfortunately, our efforts have not resulted in a viable proposal.

In our correspondence to you dated August 28, 1979, we requested submission of a complete application within 10 days. In response, however, you submitted a revised FHA 2013 dated August 30, 1979, which indicated the agreed upon rents, but with proposed expenses of $1,200 Per Unit Per Annum (PUPA). After telephone communication with this office, you submitted another revised FHA 2013 dated September 5, 1979, indicating $1,300 expenses PUPA. The proposed PUPA expenses are considerably lower than what our current records, based on comparable projects, indicate will be required to operate the project.

We have thoroughly considered your latest proposal and determined that the mortgage amount generated will not be sufficient to offset development of the project. In light of this situation, we are hereby cancelling the Notification of Selection of Preliminary Proposal.

On September 14, 1979, plaintiff responded to HUD's letter claiming that it had a binding commitment with HUD and sought a recision of and an appeal from the decision to cancel the notification of selection of plaintiff's Preliminary Proposal. On September 24, 1979, HUD informed plaintiff that its action was in accord with applicable regulations. Specifically, HUD stated in pertinent part:

[A]s 24 CFR 880.209 and 210 provide, HUD must evaluate a final proposal to determine whether such Final Proposal is consistent with the Preliminary Proposal.

The Regulations provide that if the Final Proposal is not approved, HUD shall so advise the Owner. Our letter of September 12, 1979, cancelling the Notification of Selection of Preliminary Proposal was in accord with these Regulations.

On October 12, 1979, HUD contacted ALCO Properties, Inc. (ALCO) and UMIC Housing Development Corporation (UMIC), two of the original 21 developers who submitted Preliminary Proposal to HUD in July 1978, to determine first their interest in the project and second the feasibility of their original proposals. These companies were contacted because their prior Preliminary Proposals contained rent savings features considered a significant factor in the initial ranking process. On or about December 12, 1979, HUD informed ALCO that its Preliminary Proposal for the construction of 124 units had been approved. ALCO's proposal included a PUPA figure of $1,450 and rental amounts in accord with those previously announced to plaintiff in the aforementioned July 11, 1979 letter. In August of 1980, HUD approved a rental increase from $353 per month to $371 per month for a 1 bedroom unit and $414 to $435 for a 2 bedroom unit. This increase, as was the case with the increase allowed plaintiff after acceptance of its Preliminary Proposal, reflected an increase in rentals mandated by the passage of time. *See* 24 C.F.R. § 880.209(b) (1979). ALCO's PUPA figure of $1,450 remains the figure utilized in the current operation of the project, now completed and occupied by tenants.

## II.

### A.  *Implied-In-Fact Contract Claim*

█  Plaintiff claims that, while no express construction contract was entered into by the parties, an implied-in-fact agreement was reached by the parties entitling plaintiff to damages for breach thereof. To carry its burden in proving this implied-in-fact claim, plaintiff must show the same mutual intent to contract, as well as the absence of any ambiguity in the offer and acceptance, as is required for an express

contract. *Russell Corp. v. United States,* 210 Ct.Cl. 596, 609, 537 F.2d 474, 482 (1976), *cert. denied,* 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977). Plaintiff must show an agreement based upon a meeting of the minds that can be inferred, as a fact, from the conduct of the parties under existing circumstances which manifests their tacit understanding. *Baltimore & Ohio R.R. v. United States,* 261 U.S. 592, 597, 43 S.Ct. 425, 426, 67 L.Ed. 816 (1923); *see also Somali Development Bank v. United States,* 205 Ct.Cl. 741, 508 F.2d 817, 822 (1974); *Porter v. United States,* 204 Ct.Cl. 355, 496 F.2d 583 (1974), *cert. denied* 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975); *Algonac Mfg. Co. v. United States,* 192 Ct.Cl. 649, 428 F.2d 1241 (1970). A definite offer by one party and an unconditional acceptance by the other must be established to show an implied-in-fact contract. *City of Klawock v. United States,* 2 Cl.Ct. 580, 584 (1983).

The facts in this case clearly do not support the conclusion that the parties had a meeting of the minds sufficient to create a binding contract. While plaintiff concedes that agreement was not reached on all elements of the Final Proposal, it nevertheless contends that HUD's acceptance of its Preliminary Proposal "created an implied-in-fact contract whereby the parties agreed to negotiate in good faith and to reach agreement on the Final Proposal so long as all administrative and statutory requirements were followed." Plaintiff's position is, in effect, that the parties had made an agreement to enter into a final agreement; that acceptance of a Final Proposal automatically follows acceptance of a Preliminary Proposal "as a matter of course so long as the developer follows applicable HUD regula-

tions and negotiates with HUD in good faith;" and that, by not entering into a contract with plaintiff, HUD acted in bad faith and in violation of applicable regulations.

■ Plaintiff's position ignores the obvious import of the negotiation and review procedure set forth in the regulations governing the Section 8 program.[2] These regulations manifest a clear purpose of insuring that there would be a thorough and precise review and negotiation of the many factors that comprise a final construction contract. The thrust of plaintiff's argument runs contrary to the reasonably clear purpose and function of the aforementioned regulations. Plaintiff would have HUD bind itself to a final agreement at, or during the preliminary negotiation stage. Such an argument is not only inconsistent with the regulatory scheme,[3] but does not reflect the reasonable intentions of the parties involved in such a process.

■ The conclusion to be drawn from the documented facts is that the parties did not mutually intend to bind themselves to a final contract before completing all of the steps set out in the aforementioned regulations. Upon approving plaintiff's Preliminary Proposal, HUD expressly stated in a letter to plaintiff that any final contract would be "[s]ubject to the fulfillment of all administrative and statutory requirements * * *," thereby clearly indicating that further requirements had to be met before HUD would commit itself to a final, binding agreement. *See e.g., American General Leasing, Inc. v. United States,* 218 Ct.Cl. 367, 372–373, 587 F.2d 54, 58 (1978); HUD's statement certainly was not the clear, unambiguous, definite offer that is required

2. Parties contracting with the government are charged with having knowledge of the law and regulations governing the formation of such contracts. *American General Leasing, Inc. v. United States,* 218 Ct.Cl. 367, 372, 587 F.2d 54, 58 (1978).

3. Where, as here, applicable government regulations (24 C.F.R. § 880.214 (1979) require that a contract be in writing in order to be binding and the parties contemplate a formal writing as the basis for their contractual relationship, no

contract exists absent such a final, executed writing. *American General Leasing, Inc. v. United States, supra,* 218 Ct.Cl. at 371–373, 587 F.2d at 57–58; *R/W Contracting v. United States,* 216 Ct.Cl. 421–422 (1978). *See also Ship Constr. & Trading Co. v. United States,* 91 Ct.Cl. 419, 456 (1940), *cert. denied,* 312 U.S. 699, 61 S.Ct. 737, 85 L.Ed. 1133 (1941); *Schlesinger v. United States,* 182 Ct.Cl. 571, 390 F.2d 702 (1968).

for a contract implied-in-fact. *See Tree Farm Development Corp. v. United States,* 218 Ct.Cl. 308, 319, 585 F.2d 493, 499–500 (1978); *Russell Corp. v. United States, supra,* 210 Ct.Cl. at 609, 537 F.2d at 482. Similarly, plaintiff's "conditional acceptance" of HUD's approval of its Preliminary Proposal was certainly not the "unconditional acceptance" required for an implied-in-fact contract. *See City of Klawock v. United States, supra,* and related cases cited above. Indeed, plaintiff's undisputed statement that its acceptance of defendant's approval was "conditional" clearly demonstrates that even plaintiff did not intend to be contractually bound at that stage of the negotiations.[4] Thus, plaintiff's position that HUD's approval of its Preliminary Proposal represented an agreement by the parties to ultimately form a final, binding contract is most unpersuasive.

The dealings between the parties subsequent to the acceptance of plaintiff's Preliminary Proposal also show that the parties were still negotiating over various factors germane to any future agreement between them, and that they had not reached a final, comprehensive agreement on all pertinent aspects of any such agreement. As HUD informed plaintiff in accepting its Preliminary Proposal, fulfillment of such administrative and statutory requirements was necessary before HUD would enter into a contract. Had the parties reached such a mutual agreement, a Final Proposal would have been executed by the parties. Instead, however, from May 1, 1979 to September 11, 1979, the parties were unsuccessful in their attempts to negotiate an acceptable Final Proposal. Throughout this period, as before, plaintiff continually requested a HUD insured mortgage amount in excess of the maximum amount stated in HUD's Preliminary Proposal approval letter.

Moreover, there was a fluid negotiation exchange between the parties with respect to the annual operating expenses (PUPA)

and the maximum allowable rents. Significantly, at no time in the course of negotiations did the parties reach complete mutual agreement on all of the material elements or terms (*i.e.,* the PUPA and the rental rates) which would comprise a final contract for the project. The maximum allowable rents (1 bedroom unit—$353, 2 bedroom unit—$414) set by HUD were lower than those initially proposed by plaintiff as part of its Final Proposal. Although plaintiff later purported to agree to the maximum allowable rents set by HUD in its letter of July 18, 1979, plaintiff nevertheless later increased its proposed rent to amounts in excess of the maximum allowable amount. Plaintiff did this at the same time it proposed a PUPA of $1,375, which was below HUD's minimum PUPA figure of $1,450, a figure plaintiff was made aware of previously. As a result of the failure of the parties to reach mutual agreement on these essential terms of the Final Proposal, plaintiff's proposal was found unacceptable by HUD. In a subsequent proposal, submitted August 30, 1979, plaintiff returned to the previously agreed to acceptable rental levels of $353 for a 1 bedroom unit and $414 for a 2 bedroom unit, but also included a PUPA of $1,200, substantially less than the previously announced minimum of $1,450. Plaintiff later modified this proposal by increasing the $1,200 PUPA to $1,300, a figure still below the minimum PUPA amount acceptable to HUD.

HUD thereafter terminated negotiations with plaintiff due to an inability to reach mutual agreement on an essential term of a Final Proposal. The parties' conduct during negotiations and the surrounding circumstances do not support a factual inference that there was a meeting of the minds or a tacit understanding by the parties as to all the essential terms of a binding contract. *See Baltimore & Ohio R.R. v. United States, supra,* 261 U.S. at 597, 43 S.Ct. at 426. The

---

4. Of course, even if plaintiff could show that it intended to enter into an agreement at this stage, such a showing, alone, would be insufficient as it must be shown that an implied-in- fact agreement was the *mutual* intent of both parties. In light of the materials before the court, plaintiff has failed to persuade that such mutual intendment existed.

parties simply never reached mutual agreement on all material terms of any such agreement, and to this date, as stated in the affidavit of Charles Mulligan, submitted in support of plaintiff's cross-motion for summary judgment, plaintiff still considers HUD's PUPA of $1,450 "unreasonable." Such a divergence on an essential element of a contract during negotiations is strong and convincing evidence that the parties lacked the mutual intent to enter into a binding contract.

Several decisions of the United States Court of Claims, this court's predecessor, involving somewhat comparable situations, albeit different governmental programs, have held that the government's expressed willingness to consider and review an application or a proposal, which might eventually lead to a binding agreement, is insufficient to constitute an implied-in-fact contract. See *Frangella Mushroom Farms, Inc. v. United States,* 229 Ct.Cl. ——, ——, (1981); *Diamond v. United States,* 228 Ct.Cl. 493, 500–501, 657 F.2d 1194, 1198–1199 (1981); *Maimon v. United States,* 219 Ct.Cl. 684, 686–687 (1979); *Tree Farm Development Corp. v. United States, supra,* 218 Ct.Cl. at 321–322, 585 F.2d at 501. While plaintiff correctly points out that the above-cited cases did not involve the identical government program at issue in this case, these cases are nevertheless valid support for the proposition that the government will not be bound on the basis of an implied-in-fact contract for merely accepting or approving an initial application or proposal, especially where it is apparent to the parties involved that substantial review of such a proposal, according to applicable regulatory requirements, would be necessary prior to creation of any binding commitment. In the instant case, HUD's approval of plaintiff's Preliminary Proposal did not constitute a binding contract, as not all of HUD's requirements were addressed in said proposal, but rather said approval was an expression by HUD that it would entertain negotiations with plaintiff in an attempt to reach agreement on a mutually acceptable Final Proposal. As it turned out, after extensive negotiations, a mutual agreement could *not* be reached on a PUPA figure and plaintiff's Final Proposal was not accepted by HUD and no contract was executed. Under these circumstances, and the above-cited authority, it is concluded that no implied-in-fact contract was created or existed in this case.

**B.** *Bad Faith Negotiations and Violation Of Regulations Contentions*

Plaintiff also asserts, as part of its implied-in-fact contract claim, that HUD failed "to negotiate in good faith the *requirements remaining for agreement* on a Final Proposal and thus enter into Stage Two of the process by signing an Agreement to Enter Into Housing Assistance Payments Contract * * *." (Emphasis added.) Plaintiff's framing of this argument appears to concede that, following approval of the Preliminary Proposal, numerous requirements had not yet been agreed to, and thus the parties at that point had not mutually intended to enter a binding contract. At any rate, plaintiff's bad faith argument is that HUD rescinded its acceptance without justification and without notice. This argument is without merit.

■ It is well to bear in mind that a presumption exists that public officials perform their duties in a proper manner. *Sun Oil Co. v. United States,* 215 Ct.Cl. 716, 746, 572 F.2d 786, 805 (1978). It takes "well-nigh irrefragable proof" to rebut this presumption. *Knotts v. United States,* 128 Ct.Cl. 489, 492, 121 F.Supp. 630 (1954). The materials at hand give no hint or suspicion that bad faith on the part of HUD officials led them to terminate negotiations with plaintiff and to cancel the prior notification of selection of plaintiff's Preliminary Proposal. It seems clear from the contemporary documentation made available by the parties in support of their respective motions that the inability of the parties to agree on a material and necessary factor of any final proposal was the only reason that an agreement and a binding contract was not reached and not executed by the parties.

■ Relative to plaintiff's bad faith allegation, it is to be noted that HUD selected plaintiff's Preliminary Proposal from some 21 applications and thereafter defended its selection from a challenge by one of the rejected applicants. HUD notified plaintiff in July 1979 that its minimum PUPA figure was $1,450. Plaintiff considered this figure unreasonable and refused to accept it. Plaintiff vacillated on the rental rates factor during the May—August 1979 negotiation period. On August 28, 1979, HUD informed plaintiff that its request for a rental rate increase over and above those previously agreed to was unacceptable and requested plaintiff to submit a complete Final Proposal application within 10 days. While plaintiff backed off its rental rate increase request, it did not back away from its refusal to accept the minimum PUPA figure proposed by HUD, *i.e.,* $1,450. Accordingly, HUD's letter of September 12, 1979, under the circumstances was appropriate and justifiable. From May to the end of August 1979, HUD negotiated with plaintiff in an effort to reach agreement on a Final Proposal. These actions do not support the bald bad faith allegations plaintiff now directs at HUD.

As part and parcel of plaintiff's "bad faith in negotiating" argument, is its claim that HUD's failure to give adequate notice of the reasons for rejecting the Final Proposal violated applicable regulations, namely 24 C.F.R. §§ 880.209(b), 880.210(a)–(c) (1979). Again, the materials at hand show that HUD officials dealt fairly with plaintiff relative to negotiations in accordance with applicable regulations. Section 880.209(b) provides generally that a Final Proposal shall be consistent with the approved Preliminary Proposal and that any material deviations from the Preliminary Proposal in the Final Proposal will cause reconsideration by HUD of such Final Proposal and may result in its rejection. Similarly, § 880.210(a) requires that a Final Proposal be evaluated by HUD to determine that certain regulatory provisions have been complied with and that such Final Proposal is consistent with the Preliminary Proposal. A careful reading of these regulations to-

gether with a careful reading of the documentary material provided by the parties in support of their respective motions for summary judgment fails to show any violation by HUD of these regulations in any action it took relative to plaintiff's Preliminary or Final Proposal.

Plaintiff argues, relying on § 880.210(c)(3), that in the event the parties cannot reach agreement, HUD must provide the developer with notice and an opportunity to respond to HUD's demands before deciding not to approve the Final Proposal. Plaintiff misreads § 880.210(c)(3). That section provides in pertinent part that, "[i]f a Final Proposal is not approved * * *, HUD shall so advise the Owner." HUD's letter of September 12, 1979, quoted *supra,* complied with this section. Plaintiff asserts that HUD withdrew acceptance of plaintiff's Preliminary Proposal on September 12, 1979, without giving notice of its minimum PUPA figure and without giving plaintiff an opportunity to respond to HUD's demands. Statements by plaintiff's own affiants belie this unfounded allegation. John Ferchill (Ferchill), a general partner in Prevado Village Partnership, stated in his affidavit that on July 26, 1979 the partnership met with a HUD representative who raised the issue of PUPA expenses. Ferchill, in his affidavit, indicated that there was disagreement between the parties concerning acceptable PUPA amounts. Charles Mulligan (Mulligan), in his affidavit on behalf of plaintiff, expressly stated that "[b]eginning in late July 1979, the Birmingham Area Office [of HUD] insisted on using a $1450. per unit per annum figure. It was the partnership's contention then, as it is now, that the figure was unreasonable." Thus, it is quite apparent, from plaintiff's own affiants, that plaintiff was informed of HUD's PUPA requirement prior to HUD's decision to terminate negotiations. It was not unreasonable for HUD to conclude on the basis of the adamant position of the plaintiff at the time regarding the PUPA that further negotiations would not lead to any agreement on the point.

In fact, the materials presently before the court clearly show that plaintiff was apprised of each and every requirement of HUD's, including the minimum PUPA figure and the maximum rental levels, during negotiations and prior to plaintiff's receipt of HUD's August 28, 1979 letter indicating that plaintiff had 10 days in which to submit a "*complete*" application. Yet plaintiff still submitted a proposal containing a PUPA figure it knew was less than the previously announced minimum set by HUD. Thus, this is not a situation where negotiations were terminated without adequate notice of the grounds therefor. Rather, the parties parted because they could not reach agreement on the PUPA figure. Plaintiff was simply not willing at the time to agree to HUD's $1,450 minimum PUPA figure.[5] Plaintiff's argument that HUD's August 28, 1979 letter did not again state HUD's minimum PUPA figure is meaningless. That letter was in response to plaintiff's attempt to depart from the previously agreed to rental levels. More importantly, plaintiff does not dispute that it had been, prior to the August 28th letter, informed of HUD's minimum PUPA figure.

In sum, the undisputed facts do not show a failure to negotiate in good faith on the part of HUD or a violation by HUD of any applicable regulation.

### C. *Fifth Amendment Contention*

Plaintiff finally contends that, in deciding not to approve plaintiff's Final Proposal, HUD acted in an arbitrary and capricious manner and in violation of applicable regulations. As a result, plaintiff argues, HUD violated its Fifth Amendment rights. Although it is somewhat unclear from plaintiff's submissions, plaintiff appears to assert both a "taking" and a "due process" claim under the Fifth Amendment. Neither claim is sustainable, however, under applicable law and the undisputed facts in this case.

■ To the extent that plaintiff asserts a Fifth Amendment Due Process Claim, it is well settled that this court has no jurisdiction over a claim founded upon the Due Process Clause of the Fifth Amendment since that clause cannot be read to mandate the payment of money damages. *Alabama Hospital Ass'n. v. United States,* 228 Ct.Cl. 176, 180–181, 656 F.2d 606, 609, (1981), *cert. denied,* 456 U.S. 943, 102 S.Ct. 2006, 72 L.Ed.2d 465 (1981); *see also United States v. Testan,* 424 U.S. 392, 397–398, 96 S.Ct. 948, 952–953, 47 L.Ed.2d 114 (1976); *Carruth v. United States,* 224 Ct.Cl. 422, 445, 627 F.2d 1068, 1081 (1980); *Smoke Rise, Inc. v. Washington Suburban Sanitary Comm'n,* 400 F.Supp. 1369, 1381 (D.Md.1975). Thus, plaintiff's claim of deprivation of property without due process is not sustainable in this court.

■ Although this court has jurisdiction over Fifth Amendment "taking" claims, plaintiff has failed, as a matter of law, to present such a claim. To assert a valid claim under the taking clause of the Fifth Amendment, plaintiff must demonstrate a private property interest taken for public use. In this case, plaintiff's asserted pri-

---

**5.** Plaintiff's articulation of its position in its Reply Brief, p. 9 and the statements of its own affiants suggest rather convincingly that the failure to execute a contract in this case was due to the parties' failure to agree on a PUPA figure and not to any bad faith negotiating or regulatory violations on the part of HUD. In its brief, plaintiff complains that HUD never gave it a chance to show the accuracy of their PUPA figure vis-a-vis HUD's $1,450 figure. Indeed, John Ferchill, a general partner of plaintiff, stated in his affidavit that plaintiff was so certain of the accuracy of its PUPA figure that it offered to post bond to cover the difference between its PUPA figure and HUD's $1,450 figure. Implicit in this statement is plaintiff's adamant refusal to accept HUD's PUPA figure since it concluded that its PUPA figure was correct and HUD's unreasonable. Plaintiff felt it should have been allowed to establish the validity of its PUPA figure. It is sufficient to note that it could have and should have done this in July or August 1979 if it felt so strongly about its PUPA figure. It thus appears clear that plaintiff, aware of HUD's firm minimum PUPA, still submitted its own lower PUPA figure because it strongly disagreed with HUD's figure and refused to contract on the basis of such a PUPA figure. Under the circumstances, it is not unreasonable to view the situation as involving lack of agreement between the parties rather than a lack of good faith negotiations.

vate property right is "plaintiff's expectancy that the parties would follow applicable HUD regulations in their dealings." Plaintiff contends that this expectancy is a constitutionally protected private property right under the "legitimate claim to entitlement" definition in *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Plaintiff further contends that HUD's alleged failure to follow its own regulations in the contract negotiating process constituted a taking of plaintiff's expectancy.[6]

Plaintiff's argument suffers from a critical defect in that it fails to treat the Due Process Clause in the Fifth Amendment and the taking clause as separate, independent clauses. Hence plaintiff's argument under each of these two different clauses is the same. Plaintiff alleges no property interest in the contract award. Rather, the essence of plaintiff's claim is that HUD did not fairly and adequately follow its regulations in its dealings with plaintiff. Thus, plaintiff's Fifth Amendment claim, if any, is really based upon the alleged lack of procedural due process and the deprivation of plaintiff's property interest which resulted therefrom. Therefore, plaintiff's Fifth Amendment claim is cognizable under the Due Process Clause not the Taking Clause.[7] The expectancy of procedural due process is not, in and of itself, an independent property right capable of being taken by the government for public use. As stated above, this court lacks jurisdiction over Due Process Clause claims because such claims do not involve the awarding of money damages. Consequently, plaintiff's claims un-

der the Fifth Amendment are without merit.

### III. *Conclusion*

For the above reasons, defendant's motion for summary judgment is granted and plaintiff's cross-motion for summary judgment is denied. Plaintiff's complaint is accordingly to be dismissed.

---

**6.** It is noteworthy, that the concept of a taking as a compensable claim has limited application in situations where the relative rights of the parties are determinable by their contractual relationship; interference with such contractual rights generally gives rise to a breach claim not a taking claim. *Sun Oil Co. v. United States,* 215 Ct.Cl. 716, 770, 572 F.2d 786, 818 (1978); *see J.J. Henry Co. v. United States,* 188 Ct.Cl. 39, 46, 411 F.2d 1246, 1249 (1969).

**7.** Plaintiff principally relies in *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) to define its property interest pro-

tected by both the Due Process and Taking Clauses of the Fifth Amendment. The Supreme Court on *Roth,* however, defined property interests which were subject to procedural due process. The court did not consider what constituted private property for purposes of the Taking Clause of the Fifth Amendment. Moreover, the Court in *Roth* held that an untenured state university professor was not entitled to procedural due process because he had only an "abstract concern in being rehired" but not a protected property right. *Id.* at 578, 92 S.Ct. at 2709.