Alfred **HABERMAN**, Robert Peterson, and Gail Sohler, Partners, doing business as A & B Horse Farms, a general partnership, Plaintiffs,

v.

**UNITED STATES of America,**
Defendant.

No. 90–3891C.

United States Claims Court.

Oct. 15, 1992.

18. Daniel 6:8 (King James Version).

Lawrence L. Piersol, Sioux Falls, S.D., Atty. of Record, for plaintiffs.

Nicole Anagnoste, John R. Caterini, Commercial Litigation Branch, Civ. Div., Dept. of Justice, Washington, D.C., with whom were David M. Cohen and Asst. Atty. Gen. Stuart Gerson, attys. of record, for defendant; Mark D. Etchart, Dept. of the Interior, of counsel.

## OPINION

HORN, Judge.

This case was brought by plaintiffs to redress an alleged breach by defendant, United States, of a contract between plaintiffs and the Bureau of Land Management (BLM) of the United States Department of the Interior (DOI). This case is before the court on the government's motion to dismiss the plaintiffs' complaint for lack of subject matter jurisdiction pursuant to Rules 12(b)(1) and 12(b)(4) of the Rules of the United States Claims Court (RUSCC). Plaintiffs oppose this motion on the basis that a valid and binding contract, express or implied in fact, exists between the parties. Both parties waived oral argument on the motion. After carefully reviewing the submissions of the parties, as is more fully discussed below, the court, hereby, DENIES defendant's motion to dismiss.

## FACTS

A & B Horse Farms is a partnership formed by the plaintiffs for the purpose of adopting wild horses under the Wild Free–Roaming Horses and Burros Act, Pub.L. 92–195, Dec. 15, 1971, 85 Stat. 649, *codified* at 16 U.S.C. §§ 1331–1340 (1982) (the Act). A & B Horse Farms holds a general power of attorney for approximately one-hundred fifty individuals who wished to adopt wild horses pursuant to the Act. On behalf of these individuals, in June, 1986, A & B Horse Farms contacted the Clark Mills & Sons wild horse ranch in Bloomfield, Nebraska, one of three privately owned wild horse holding facilities under contract to BLM, regarding the possibility of adopting BLM wild horses pursuant to the Act.

The Act provides that BLM shall manage the population of wild horses and burros on federal lands "in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1333(a). The Act empowers the Secretary of DOI to make a determination that "an overpopulation" exists on a given area of public lands and that action is necessary to remove excess animals from the range so as to achieve proper management levels. Upon such determination, the Secretary may authorize the humane capture of excess wild free-roaming horses and burros and place them, through an adoption process, with qualified individuals. 16 U.S.C. § 1333(b)(2). The Act further provides that, following transfer of the animals, qualified individuals may obtain title to the wild horses, after demonstrating to the Secretary that the adopter has provided "humane conditions, treatment and care for such animals for a period of one year, the Secretary is authorized upon application of the transferee to grant title to not more than four animals to the transferee at the end of the one year period." 16 U.S.C. § 1333(c).

Each of the approximately one-hundred fifty individual adopters for whom A & B Horse Farms held a general power of attorney completed an Adopt–A–Horse Screening Guide to assist the BLM officials in

determining the eligibility of the potential adopters. Each applicant was also required to complete an Application For Adoption of Wild Horse(s) or Burro(s), BLM Form No. 4710–10. 43 C.F.R. § 4740.4–2 (1985).

Prior to assuming possession of the horses, a Private Maintenance and Care Agreement for Wild Horses and Burros, BLM Form No. 4710–9, was also completed by each adopter. *See* 43 C.F.R. § 4750.4–1 (1985). The agreement provides for the maintenance, protection and welfare of the wild horses and burros, and states the terms for adoption in accordance with the provisions of the Act. This agreement is signed by the authorized BLM officer, the adopter and, if applicable, the person holding the adopter's power-of-attorney.

Prior to initiation of the adoption process, the horses were maintained on a ranch in Bloomfield, Nebraska. A & B Horse Farms obtained six-hundred geldings, ranging in age from three to over thirty-one years of age, from the Bloomfield holding facility. A & B Horse Farms contracted with a number of ranchers to pasture the wild horses obtained from BLM. The last day of transportation of the horses from the holding facility in Bloomfield, and the official date of adoption, was October 21, 1986.[1]

At the conclusion of the one-year adoption period, BLM requested that A & B Horse Farms transport the horses to Yankton, South Dakota, so that BLM could conduct a field inspection prior to issuing title to the horses. A & B Horse Farms, therefore, assembled the approximately four-hundred sixty-two horses which had survived the one-year period at the Stockmen's Livestock Auction in Yankton, South Dakota.

In Yankton, BLM officials Bruce Stevens, Jean Bowdle and Jack Steinbreck conducted a field inspection of the horses.

The BLM officials determined that the horses had received proper care and humane treatment for the preceding one-year period. According to the complaint, BLM "also determined that A & B Horse Farms and the individual adopters had complied with all the terms, requirements, and obligations set forth in the Private Maintenance and Care Agreement, and with all other laws and regulations governing the adoption of wild horses."

At the time of the inspection, BLM official, Jack Steinbreck, questioned A & B Horse Farms regarding where the horses would be shipped after the conclusion of the inspection. A & B Horse Farms told Steinbreck, in the presence of Bruce Stevens and Jean Bowdle, that the horses were being shipped to Montana. During the inspection, BLM official Jack Steinbreck allegedly made statements to officials of A & B Horse Farms that the horses were now the property of A & B Horse Farms "to do with as it pleased."

According to plaintiffs, BLM officials told A & B Horse Farms that titles to the horses could be issued on the evening of October 27, 1987, but suggested that title be issued later and mailed to the individual adopters. A & B Horse Farms agreed to have the titles mailed. According to plaintiffs, BLM officials assured A & B Horse Farms that title was not needed to ship the horses to Montana. Plaintiffs shipped the horses to Montana on November 2, 1987, leaving approximately ten horses behind in a holding pen in Yankton, South Dakota.

On October 28, 1987, BLM received a telegram from the Fund for Animals Inc. alerting BLM that it had come to the Fund's attention that A & B Horse Farms intended "commercial exploitation of the horses," upon passage of title. As a result, on November 10, 1987, BLM confiscated the bulk of the horses in Great Falls, Montana. On November 22, 1987, BLM confiscated the remaining ten horses from

---

**1.** Because the adoption application processing took place before October 1, 1986, the date on which a revised version of the relevant portions of 43 C.F.R. became effective, those activities are governed by the 1985 version of the C.F.R. It is not clear from the record on which date(s) the Private Maintenance and Care Agreements were executed. It appears clear, however, that the official date of adoption was October 21, 1986. Therefore, the 1986 version of the relevant parts of 43 C.F.R. are applicable to adopters seeking title, and the conditions of qualifications for obtaining title.

the holding pen west of Yankton. According to plaintiffs, they received neither notice of, nor an explanation for, these actions by BLM.[2]

After the horses were confiscated by the government, plaintiffs, A & B Horse Farms, on behalf of the individual adopters, demanded just compensation for the allegedly unlawful taking or conversion of the horses plaintiffs claim to have adopted, as follows:

> For the foregoing reasons, A & B Horse Farm demands fair and just compensation for the extensive damages it has suffered because of the BLM actions set forth above. Specifically, A & B Horse Farm demands compensation in the amount of $2.40 per day for each of the horses fed and cared for by A & B Horse Farm, which amounts to a sum in excess of $440,000.00, or in the alternative, compensation in the amount of $173,329.22, which sum represents the following items:

| | |
|---|---|
| fair value of the 462 horses unlawfully seized by the BLM | $144,144.00 |
| interest on $144,144.00 from November 10, 1987 to present | 7,207.20 |
| transportation costs incurred pursuant to BLM's request to assemble the horses in Yankton for inspection | 2,749.00 |
| transportation costs from Yankton to Montana | 13,464.00 |
| attorney fees and costs incurred from November through April in pursuing this claim | 5,158.68 |
| court reporter fees for interviews with Inspector General | 606.34 |
| | $173,329.22 |

Plaintiffs' demand for reimbursement was denied by the United States Department of Interior.

Prior to filing the complaint now before this court, plaintiffs had filed an earlier complaint, Case No. 664–88C, also in this court, based on the same set of facts, and asking for relief. In their initial complaint, plaintiffs had claimed that: (1) by failing to issue title to the horses to the plaintiffs, BLM officials violated 16 U.S.C. § 1333(c); (2) BLM breached an express contract with plaintiffs which required BLM to issue titles to the horses; (3) BLM breached an implied contract with plaintiffs which required BLM to issue titles to the horses; (4) BLM has been unjustly enriched by plaintiffs' compliance with the Private Maintenance and Care Agreement since ordinarily BLM contracts for the care of similar animals at the rate of $2.40 per head per day; (5) BLM's confiscation of the horses constitutes a taking without due process of law; and (6) BLM's issuance of titles to other similarly situated parties denies plaintiffs the equal protection of law.

Defendant filed a motion to dismiss the earlier lawsuit based on lack of jurisdiction in the Claims Court, which was granted by the judge previously assigned to plaintiffs' case. *Haberman v. United States*, 18 Cl. Ct. 302 (1989). The court found on plaintiffs' claim (1) that 16 U.S.C. § 1333 was not the type of money-mandating statute sufficient to create jurisdiction in the United States Claims Court. On claims (2) and (3), the judge decided that jurisdiction was lacking because plaintiffs had failed to properly certify the claim presented, as required by the Contract Disputes Act, 41 U.S.C. §§ 601–613 (1988). Regarding plaintiffs' claim (4) for unjust enrichment, the

---

**2.** In the Opinion and Order, discussed more fully below, dismissing the plaintiffs' first complaint on jurisdictional grounds, the judge assigned the earlier case wrote:

> BLM subsequently received information that A & B Horse Farms was adopting the horses with the intent to sell them for slaughter once title passed, conduct in direct contravention of the Act's requirements that adop-

> ter's be 'qualified individuals' who 'can assure humane treatment and care.' 16 U.S.C. § 1333(b)(2)(B). Accordingly, BLM officials confiscated the horses in Great Falls, Montana on November 10, 1987 and confiscated the remaining ten horses in Yankton, South Dakota on November 22, 1987.

*Haberman v. United States*, 18 Cl.Ct. 302, 305 (1989).

court wrote that the United States cannot be held liable for contracts implied in law. In order to be sued, the United States must have relinquished its sovereign immunity and it has not been so relinquished for contracts implied in law. The court also found that since title had never passed to plaintiffs, there was no private property the deprivation of which could form the basis of a claim under the Fifth Amendment. Finally, the court rejected the plaintiffs' cause of action based on an equal protection argument because claims based on the due process and equal protection clause do not alone constitute the type of money-mandating claims within this court's jurisdiction.

After dismissal of the initial lawsuit on November 6, 1990, plaintiffs went back to DOI and filed a certified claim with the Agency. In a letter, dated November 1, 1990, the DOI contracting officer denied the certified claim.

After plaintiffs' certified claim had been denied by the DOI, plaintiffs filed the instant lawsuit, Case No. 90–3891C, in this court. In the newly filed action, the plaintiffs reasserted but two of the original claims included in their earlier lawsuit. Plaintiffs now argue only that the actions of the BLM constituted a breach of either an express or implied in fact contract, entitling plaintiffs to compensation.

In their second complaint, currently before this court, plaintiffs request the following relief:

1. Judgement for the Plaintiffs in the sum equal to the reasonable value of the confiscated horses; or, in the alternative, judgment in favor of the Plaintiffs in a sum equal to the reasonable value of the care and maintenance of the horses;

2. Judgment in favor of the Plaintiffs for costs and expenses herein; and,

3. Such further relief that the Court deems just and equitable.

## DISCUSSION

■■■ A motion to dismiss, pursuant to RUSCC 12(b)(1) and RUSCC 12(b)(4), based on a challenge to the jurisdiction of the court, requires that the court reach its decision based on the evidence presented by the parties. The Supreme Court has clearly articulated, and the United States Court of Appeals for the Federal Circuit has explicitly adopted, the general standards for weighing evidence presented in a complaint when deciding a motion to dismiss, as follows: "in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *accord Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed.Cir. 1989). If a motion to dismiss for lack of subject matter jurisdiction challenges the truth of the jurisdictional facts alleged in the complaint, the trial court may also consider relevant evidence in order to resolve disputed facts. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir.1988). The court must accept as true any undisputed allegations of fact made by plaintiff. In evaluating a motion to dismiss for failure to state a claim, the court must presume all factual allegations in the complaint are true. *Miree v. DeKalb County*, 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 2492 n. 2, 53 L.Ed.2d 557 (1977). *See also Scheuer*, 416 U.S. at 236, 94 S.Ct. at 1686. When facts relevant to the issue of jurisdiction are disputed, the court is required to decide those facts. *Reynolds*, 846 F.2d at 747. The burden is on the plaintiff to establish jurisdiction. *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936); *Pasco Enterprises v. United States*, 13 Cl.Ct. 302, 305 (1987); *Metzger, Shadyac & Schwartz v. United States*, 10 Cl.Ct. 107, 109 (1986). A motion to dismiss should not be dismissed by the court "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). In a determination of the validity of the motion to dismiss "conclusory allegations unsupported by any factual assertions will not withstand a

motion to dismiss." *Briscoe v. LaHue*, 663 F.2d 713, 723 (7th Cir.1981), *aff'd*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983). Moreover, "legal conclusions, deductions, or opinions couched as factual allegations are not given a presumption of truthfulness." 2A Jeremy C. Moore, et al., Moore's Federal Practice, ¶ 12.07 [2.–5] (2d ed. 1992).

█ In order to recover from the United States in the case at bar, plaintiffs must establish either an express or implied-in-fact contractual relationship with the United States. Plaintiffs must also establish that they have fulfilled the terms of that contract and that no breach has occurred. It is the court's function, not that of the parties', to interpret, construe, and determine: first, if the parties entered into an enforceable contract, and, second, whether such contract was breached. Mere characterizations of the transaction by the parties, or mere contract formalisms cannot alter the substance of the transaction. *Aiken v. United States*, 4 Cl.Ct. 685, 694 (1984).

█ Plaintiffs allege that through the Adopt–A–Horse Screening Guide and other documents, including the Private Maintenance and Care Agreement, plaintiffs had a valid and enforceable contract with BLM, which obligated BLM to issue title to the horses after the one-year period. Plaintiffs also allege that the regulations issued by BLM, and correspondence between plaintiffs and BLM, including the Adopt–A–Horse Screening Guide, resulted in an implied-in-fact contract between plaintiffs and defendant, whereby BLM was required to issue titles to the horses.[3]

The defendant argues that this court lacks jurisdiction to entertain plaintiffs' contract claim because it sounds in tort, that plaintiffs have failed to establish the existence of an express or implied in fact contract, that plaintiffs' claim for breach of an implied in fact contract is barred by *res judicata*, and that plaintiffs are not the proper parties in interest to sue based upon the alleged contract with the government.

In opposition to the defendant's motion to dismiss, plaintiffs allege that they have established that a contract, either express or implied in fact, exists between plaintiffs and the government. Further, plaintiffs assert that the court does not lack jurisdiction because the plaintiffs are the real parties in interest to the contract with the government. Plaintiffs argue, in the alternative, that if the court holds that they are not the proper party, plaintiffs should be allowed an opportunity to join or substitute the approximately one-hundred fifty individual private adopters as party plaintiffs.

█ The required elements of an express contract are as follows: "For there to be an express contract, the parties must have intended to be bound and must have expressed their intention in a manner capable of being understood. A definite offer and an unconditional acceptance must be established." *Russell Corp. v. United States*, 210 Ct.Cl. 596, 608, 537 F.2d 474, 481 (1976), *cert. denied*, 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977). An implied-in-fact contract likewise requires a meeting of the minds, which, although not embodied in an express contract, is clear from the conduct of the parties. *Id.* at 609, 537 F.2d at 482. *See also Baltimore & Ohio R.R. v. United States*, 261 U.S. 592, 597, 43 S.Ct. 425, 426, 67 L.Ed. 816 (1923); *Fincke v. United States*, 230 Ct.Cl. 233, 243–244, 675 F.2d 289, 295 (1982).

█ The requirements for establishing an express or implied in fact contract are similar.[4] *Marshall v. United States*,

---

3. "As a general rule, there can be no implied contract where there is an express contract between parties covering the same subject." *Algonac Mfg. Co. v. United States*, 192 Ct.Cl. 649, 673, 428 F.2d 1241, 1255 (1970).

4. Implied in law contracts, in which a duty is imposed by operation of law, without regard to the intention of the parties, however, differ from implied in fact contracts. Implied in law contracts operate as contracts for the purposes of remedy only. As stated by the Court of Claims in *Russell*, such implied in law contracts are not within the jurisdiction of the United States Court of Claims. Likewise, jurisdiction also could not be found in the United States Claims Court. *Russell Corp. v. United States*, 210 Ct.Cl. at 609, 537 F.2d at 482.

21 Cl.Ct. 497, 499 (1990); *Pacific Gas & Elec. Co. v. United States*, 3 Cl.Ct. 329, 338–39 (1983), *aff'd*, 738 F.2d 452 (Fed.Cir. 1984). Plaintiffs must show "mutuality of intent to contract, offer and acceptance, and that the officer whose conduct is relied upon had actual authority to bind the government in contract." *See H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1575 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985); *Howard v. United States*, 21 Cl.Ct. 475, 478 (1990), *aff'd*, 951 F.2d 1267 (Fed.Cir. 1991), *reh., en banc, denied*, (Fed.Cir. Feb. 20, 1992).

■ The facts show BLM's Adopt–A–Horse Screening Guide does not constitute an express contract between plaintiffs and the government. This form does not unambiguously manifest the government's "acceptance" of plaintiffs' "offer" to adopt wild horses. Rather, it clearly informs the adopter that he or she must make further application and undergo further screening in order to qualify for the program, and move towards obtaining title. The Adopt–A–Horse Screening Guide makes specific reference to the need for the parties subsequently to sign a Private Maintenance and Care Agreement, and that title will pass in the future, dependent on the fulfillment of certain conditions.

While the Adopt–A–Horse Screening Guide by itself does not rise to the level of an express contract, the Private Maintenance and Care Agreement, BLM Form, No. 4710–9, does constitute such an express contractual document. The Agreement states in the upper right-hand corner:

"NOTE: THIS IS A CONTRACT: RETAIN WITH OTHER LEGAL RECORDS."

The agreement also contains the following language:

[Preceded by a Blank to Fill in name of Adopter] and the Bureau of Land Management for the United State of America for and in consideration of the mutual benefits hereunder, and in accordance with Public Law 92–195, § 3(b), do enter into this agreement for the maintenance, protection, and the welfare of wild horses and burros.

The Private Maintenance and Care Agreement allows for signature by the adopter, the person having the power of attorney, if applicable, and, an authorized agent of the BLM. The document by its terms and the process of reaching agreement result in a classic contract, with each of the elements of mutuality of intent, consideration, offer and acceptance, and proper governmental authorization present. Mutuality of intent is established by the signatures of the adopter, and or of his/her authorized signator, and of the authorized BLM agent. As consideration, the adopter receives up to four horses, and BLM, thereby, reduces its burden and cost of caring for the animals on government lands. The offer is present in the Application for Adoption of Wild Horses, which demonstrates the applicant's desire to adopt the wild animal(s), and acceptance is evident from the execution of the Private Maintenance and Care Agreement.

■ The general rule regarding the authority of government agents to bind the government is discussed in *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947). Anyone entering into an agreement with the government takes the risk of having accurately ascertained that the agent who purports to act for the government stays within his/her authority. *Federal Crop Ins.*, 332 U.S. at 384, 68 S.Ct. at 3. Section 1333(b)(2)(B) of Title 16, United States Code, expressly grants the Secretary authority to transfer title to the horses to private individuals who have complied with certain specified terms, including the ability to provide humane treatment and care. The Act also grants the Secretary full discretion to determine whether the necessary conditions for the issuance of title have been met, including that the individual "has provided humane conditions, treatment & care for such animal or animals for a period of one year." 16 U.S.C. § 1333(c). The authority to issue title is delegated by the Secretary of DOI to an authorized DOI

officer pursuant to regulations found in 43 C.F.R. § 4740.5 (1985) as follows:

### § 4740.5 Granting of Title

(a) The authorized officer may grant title to not more than four wild free-roaming horses and burros in any one year upon application of any qualified person, organization, or agency to whom these animals have been transferred for adoption. Applicants for granting of title must be of legal age in the State in which they reside.

(b) Persons, organizations, or agencies who have provided humane conditions, treatment, and care for the animals they have adopted after December 15, 1971, for at least one year under a cooperative agreement with the Bureau of Land Management are qualified to apply for title to the animals. The application for a title shall include a written statement of a licensed veterinarian attesting to the best of his knowledge that the animals have been given humane treatment and care preceding the filing of the application.

\* \* \* \* \* \*

■ Defendant alleges that, even assuming the existence of an enforceable express contract, this court lacks jurisdiction to entertain plaintiffs' contract claim because, in fact, it sounds in tort. Defendant charges that plaintiffs' complaint states an action for alleged wrongful conversion, which is a tort. It is correct that this court may not entertain claims outside the specific jurisdictional authority conferred by Congress, including those actions sounding in tort. *Soriano v. United States*, 352 U.S. 270, 273, 77 S.Ct. 269, 271, 1 L.Ed.2d 306 (1957); *Eliel v. United States*, 18 Cl.Ct. 461, 466 (1989), *aff'd*, 909 F.2d 1495 (Fed. Cir.1990), *reh. denied* (Fed.Cir. Aug. 22, 1990); *Somali Dev. Bank v. United States*, 205 Ct.Cl. 741, 752, 508 F.2d 817, 820 (1974). It is not fatal to plaintiffs' claims, however, that the actions alleged might constitute both a tort and a breach of contract. *Peter v. United States*, 6 Cl.Ct. 768, 779 (1984). Where an enforceable contract exists, the fact that the alleged breach is also tortious does not place the action be-

yond the scope of the Tucker Act simply because elements of tort are present. *Fountain v. United States*, 192 Ct.Cl. 495, 498, 427 F.2d 759, 761 (1970), *cert. denied sub. nom., Fountain v. Redevelopment Land Agency*, 404 U.S. 839, 92 S.Ct. 131, 30 L.Ed.2d 73 (1971). Since we hold that a valid contract exists, this court has jurisdiction to consider plaintiffs' claim for breach of that express contract, notwithstanding the possible existence of a remedy in tort.

■ Defendant has also argued that based on plaintiffs' earlier filed complaint, Case No. 664–88C, the action now before this court, Case No. 90–3891C, which alleges breach of contract, should be deemed *res judicata*. If a case has been disposed of on the merits by a previous Order or Opinion in this court, a subsequent action on the same grounds should not be entertained. *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979). But, such is not the instant case. Nor is the doctrine of "issue preclusion" one behind which the defendant ought to be allowed to hide in the instant case. *See Mother's Restaurant, Inc. v. Mama's Pizza, Inc.*, 723 F.2d 1566, 1569 (Fed.Cir.1983).

The doctrine of *res judicata*, does not apply to the case at bar because the Opinion and Order issued in the earlier *Haberman v. United States* case, 18 Cl.Ct. 302, dismissed plaintiffs' various causes of action on grounds different from the issues presented to the court in the current lawsuit. Addressing plaintiffs' claims for breach of express or implied contract under the Contract Disputes Act, 41 U.S.C. § 601–13 (1988) (CDA), the previous judge assigned the *Haberman* case wrote:

The claim submitted, however, was clearly not certified and for this reason alone the Claims Court must dismiss the express and implied contract counts. The fact that a contracting officer has rendered a decision on the merits of an uncertified claim is of no consequence since a contracting officer does not have authority to waive the certification requirement imposed by Congress. *Paul E. Lehman, Inc. v. United States*, 230 Ct.Cl. 11, 17, 673 F.2d 352, 356 (1982).

When a contractor is proceeding under the CDA and its case is dismissed for lack of jurisdiction, the proper course of action is for the contractor to properly certify the claim pursuant to 41 U.S.C. § 605 and resubmit it to the contracting officer. *W.M. Schlosser Co. v. United States*, 705 F.2d 1336, 1340 (Fed.Cir. 1983); *Skelly & Loy v. United States*, 231 Ct.Cl. 370, 377, 685 F.2d 414, 419 (1982).

*Haberman v. United States*, 18 Cl.Ct. at 307. The direction to plaintiffs' implicit in the earlier Claims Court Opinion & Order, which dismissed the complaint on jurisdictional grounds, pursuant to the CDA, was to suggest to plaintiffs that they could seek to certify their claim by presenting it to the DOI for processing, and, if appropriate, file a new lawsuit in the United States Claims Court, once certification had been accomplished. This is precisely the path plaintiffs followed.

Moreover, the court in the earlier *Haberman* decision specifically noted that the complaint presented in the earlier case, No. 664–88C, was not clear regarding whether or not a contract existed between the parties. The earlier *Haberman* court wrote:

> The complaint is not clear about the precise contractual arrangements between BLM and A & B Farms (the partnership) and between BLM and each of the individual adopters. *See* Complaint, ¶¶ VII, X and XXXI, Exhibit A (¶ 3 & ¶ "OBTAINING TITLE") and Exhibit B (2d par.). *Presumably* each of the 150 adopters made application to BLM to adopt four wild horses, executed an Adopt–A–Horse Screening Guide in the form of Exhibit A to the complaint and, prior to obtaining possession of the horses, entered a separate written agreement with

> BLM entitled Private Maintenance and Care Agreement. *Id.* No copy of a Private Maintenance and Care Agreement was submitted with the complaint or attached to any of the motion papers. Further, *presumably*, there was no direct express contractual relationship between A & B Horse Farms and BLM. *Id.* (emphasis added).

*Haberman v. United States*, 18 Cl.Ct. at 304 n. 2.

The instant lawsuit, on which this court now is asked to rule, raises different jurisdictional and substantive issues for review than those decided in the earlier *Haberman* Opinion and Order. Plaintiffs now present a properly certified breach of contract claim to the court, over which this court has jurisdiction, and, for the first time, this court is presented for decision with the merits of those breach of contract claims.

■ Finally, defendant also argues that this court lacks jurisdiction because plaintiffs are not the real party in interest to the contract with the government. BLM claims that A & B Horse Farms did not file an application with BLM for the adoption of the horses, but rather that the one-hundred fifty individual adopters filed the applications to adopt the six-hundred geldings at issue here.

Under the Rules of the United States Claims Court (RUSCC), every action must be prosecuted in the name of the real party in interest. RUSCC 17(a). The rule also states that a party with whom or in whose name a contract has been made for the benefit of another, or a party authorized by statute may sue in that person's own name without joining the party for whose benefit the action is brought. RUSCC 17(a).[5] *See also H.F. Allen Orchards v. United*

---

5. RUSCC 17. Parties Plaintiff and Defendant; Capacity

(a) Real Party in Interest. Every action shall be prosecuted in the name of the real party in interest. An executor, administrator, guardian, bailee, trustee of an express trust, a party with whom or in whose name a contract has been made for the benefit of another, or a party authorized by statute may sue in that person's own name without joining the party for whose benefit the action is brought. No

action shall be dismissed on the ground that it is not prosecuted in the name of the real party interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

*States,* 749 F.2d at 1576. Similarly, the Federal Rules of Civil Procedure provide that every action must be prosecuted in the name of the real party in interest. Fed. R.Civ.P. 17(a).[6] In the federal courts, it has been held that the "real party in interest" is one possessing the legal right to enforce the claim under applicable substantive law. *Boeing Airplane Co. v. Perry,* 322 F.2d 589, 591 (10th Cir.1963), *cert. denied,* 375 U.S. 984, 84 S.Ct. 516, 11 L.Ed.2d 472 (1964).

The individual adopters entered into notarized general power of attorney agreements with A & B Horse Farms.[7] Then, A & B Horse Farms, and the individual adopters, appear to have signed the Private Maintenance and Care Agreement with BLM.[8] If any of the adopters did not individually sign a particular Private Maintenance and Care Agreement, the agreement was signed and accepted by the authorized BLM official in the form offered. BLM acknowledged A & B Horse Farms' position, and would appear to have waived any objections to A & B Horse Farms' standing. A & B Horse Farms, therefore, has a right to attempt to enforce the claim at issue under the valid power of attorney granted by the individual adopters, and accepted by the BLM, and, therefore, to sue on behalf of, and in the name of the individual adopters.

■ Defendant cites to *American National Bank & Trust Company of Chicago v. United States* for the proposition that unrelated third parties, not in privity with the government, cannot acquire and enforce contract claims against it. 22 Cl.Ct. 7, 14 (1990).[9] The cited case is distinguishable from the case at bar because the plaintiff in the cited case had voluntarily assigned its contract rights to a third party. In the above-captioned case, BLM provided the individual adopters with a power of attorney form which grants plaintiffs, as attorney in fact, the power to select, receive, possess and transport the Adopter's horses on behalf of the individual adopters.[10] The power of attorney form also grants to plaintiffs:

> ... every proper power necessary to carry out the purposes for which this power is granted, including the signing of the Private Maintenance and Care Agree-

**6.** In general, the Rules of the United States Claims Court (RUSCC) are closely patterned upon the Federal Rules of Civil Procedure (Fed. R.Civ.P.). Therefore, precedent under the Fed. R.Civ.P. is relevant to interpreting the RUSCC. *See Imperial Van Lines Int'l, Inc. v. United States,* 821 F.2d 634, 637 (Fed.Cir.1987); *Lichtefeld–Massaro, Inc. v. United States,* 17 Cl.Ct. 67, 70 (1989).

**7.** At the time of the adoption proceedings at issue in the instant case, the power of attorney form signed by plaintiffs allowed the individual adopters to maintain and care for the horses as a group in order to qualify for a fee waiver from BLM. This practice was challenged in *Animal Protection Institute, Inc. v. Hodel,* 671 F.Supp. 695, 697 (D.Nev.1987), *aff'd,* 860 F.2d 920, 927–28 (9th Cir.1988) (holding that Secretary may not transfer title to persons who intend to use the animals for commercial purposes). BLM voluntarily suspended the practice of granting fee waivers for large scale adoptions in April, 1988. *See* 43 C.F.R. § 4750.3–3, as amended Sept. 25, 1990.

**8.** The limited, and barely legible, documentation provided to the court for the purpose of deciding the instant motion to dismiss, however, does not clearly indicate if all the individual adopters and an A & B Horse Farm representative actually signed each of the Private Maintenance and Care Agreements.

**9.** Defendant also cites to the Federal Anti–Assignment Statute, 31 U.S.C. § 3727 (1988), which applies to assignments of claims against the government, to argue that plaintiffs' claims are barred. The federal statute refers to "[a]ll powers of attorney, orders, or other authorities for receiving payment of any such claim" and then proceeds to declare them null and void unless executed in the presence of two witnesses after the allowance of a claim. *See* 31 U.S.C. § 203. Section 203 is not applicable to the power of attorney in the present instance. The power of attorney granted by the individual adopters to plaintiffs was not an assignment of a claim. Rather, it was an assignment of their rights to enter into an agreement with the government to care for and maintain wild horses. Thus, plaintiffs' claims are not barred by the Federal Anti–Assignment Statute.

**10.** Defendant's brief in favor of its motion to dismiss states:

> Although the Rock Springs District BLM office provided adopters with a draft document entitled "Power of Attorney," this document was not a BLM form.

ment between myself [the Adopter] and the Bureau of Land Management....

The power of attorney form also specifically names A & B Horse Farms as the attorney in fact, and grants the power to sign its name, and, if necessary, the names of the private adopters to the Private Maintenance and Care Agreement. Thus, in the instant case, there was no danger of exposing the government to suits by "undisclosed principals" as was feared in *American National Bank & Trust*, 22 Cl.Ct. at 14. Indeed, most, if not all, of the contacts that BLM had with the adopters included a signature by plaintiffs, A & B Horse Farms.

Defendant's reliance on *Triton Group v. United States* is also misplaced. 10 Cl.Ct. 128 (1986), *aff'd*, 818 F.2d 876 (Fed.Cir. 1987). *Triton* involved a power of attorney entered into solely for the purpose of pursuing a claim against the government. *Triton, supra*, at 132. In addition, the attorney in fact had not actually signed the lease with the government. *Id.* Here, however, plaintiffs entered the power of attorney before the claim arose, and the plaintiffs actually signed the Private Maintenance and Care Agreements.

Although the defendant's motion to dismiss must be denied, the court feels constrained to comment, without deciding at this point, on the merits of the case. In future proceedings, one of the key issues presented will be whether plaintiffs were subverting the contract and the subverting the purposes of the Wild Free–Roaming Horses & Burros Act, by adopting the horses for purposes other than those to which plaintiffs agreed when they signed the Private Maintenance and Care Agreement. If, in fact, plaintiffs adopted the horses with the intention of using them for commercial purposes, including having them slaughtered, they have breached the agreement between the parties and have violated the Act. Although in the papers presented to the court there is sufficient documentation to demonstrate that the parties entered into a contract, there is insufficient documentation to conclude whether a breach occurred.

Sections 16 U.S.C. §§ 1331–1340 are found in Chapter 30 of the Wild Free–Roaming Horses & Burros Act, and are titled "Wild Horses & Burros: Protection, Management & Control." The statute is very clear that the transfer of any wild horses or burros can only be made if the Secretary of DOI can "assure humane treatment and care ..." 16 U.S.C. § 1333(b)(2)(B). Final title to the adopted animals can only be transferred by the Secretary of DOI upon application by the transferee, and after a determination by the Secretary that such adopter has provided "humane conditions, treatment and care for such animal or animals for a period of one year." 16 U.S.C. § 1333(c).

Regulations issued on October 1, 1986, pursuant to 16 U.S.C. §§ 1331–40, to implement the laws relating to the protection, management and control of wild horses and burros under the administration of the BLM provide:

4750.5 Application for title to wild horses and burros.

(a) The adopter shall apply for title, using a form designated by the Director, upon signing the Private Maintenance and Care Agreement.

(b) The authorized officer shall issue a Certificate of Title after 12 months, if the adopter has complied with the terms and conditions of the agreement and the authorized officer determines, based either on a field inspection or a statement provided by the adopter from a veterinarian, extension agent, local humane official, or other individual acceptable to the authorized officer, that the animal or animals covered by the Agreement have received proper care and humane treatment.

\* \* \* \* \* \*

43 C.F.R. § 4750.5(a) & (b) (1986).

The same regulations also specifically list prohibited acts as follows:

§ 4770.1 Prohibited acts.

The following acts are prohibited:

(a) Maliciously or negligently injuring or harassing a wild horse or burro;

(b) Removing or attempting to remove a wild horse or burro from the public lands without authorization from the authorized officer;

(c) Destroying a wild horse or burro without authorization from the authorized officer except as an act of mercy;

(d) Selling or attempting to sell, directly or indirectly, a wild horse or burro or its remains;

(e) Commercially exploiting a wild horse or burro;

(f) Treating a wild horse or burro inhumanely;

(g) Violating a term or condition or the Private Maintenance and Care Agreement;

(h) Branding a wild horse or burro;

(i) Removing or altering a freeze mark on a wild horse or burro;

(j) Violating an order, term, or condition established by the authorized officer under this part.

43 C.F.R. § 4770.1. The regulations also provide civil and criminal penalties for violations of 43 C.F.R. § 4770.1.

Furthermore, the statute provides criminal penalties for maliciously causing the death or harassment of any wild free-roaming horse or burro. 16 U.S.C. § 1338(a)(3), and for processing or permitting to be processed into commercial products the remains of a wild free-roaming horse or burro. 16 U.S.C. § 1338(a)(4).

In the brief record presented to the court as part of the defendant's motion to dismiss, there is only limited evidence, namely, the telegram from the Animal Rights Fund, regarding the intended use of the wild horses by the plaintiffs and individual adopters following the passage of title to the horses. The telegram states in relevant part:

IT HAS COME TO OUR ATTENTION THAT A & B HORSE FARMS IS ASSEMBLING FOR SALE AT A SALE BARN LOCATED IN YANKTON SOUTH DAKOTA THE SURVIVORS OF APPROXIMATELY 600 HORSES PLACED IN THEIR CARE BY THE BUREAU ON OR ABOUT OCTOBER 21, 1986. WE ARE INFORMED THAT THE SALE BARN IS OWNED BY GAIL SOHLER, ONE OF THE PRINCIPALS OR PARTNERS OF A & B HORSE FARMS. WE ASSUME THAT TITLE TO THESE HORSES HAS NOT YET PASSED. IT IS ENTIRELY OBVIOUS THAT COMMERCIAL EXPLOTATION [SIC] OF THE HORSES IS INTENDED.

Although the limited evidence in the record raises a question as to whether or not the plaintiffs' motives and intentions were consistent with the statute, regulations, and Private Maintenance and Care Agreement, there is not enough evidence in the record to convert defendant's motion to dismiss to one for summary judgment, and to dispose of the case at this time. Although the court finds that this court does have jurisdiction to hear plaintiffs' breach of contract action, in future proceedings, plaintiffs will have to overcome the suggestion, raised in the record before this court, that a breach on their part may have occurred.

The Adopt–A–Horse Screening Guide, the Application for Adoption of Wild Horses or Burros, the Power of Attorney and the Private Maintenance and Care Agreement, signed by the plaintiffs, all refer to the commitments made by the adopters of the wild animal to provide humane and caring treatment to the animals. The Adopt–A–Horse Screening Guide refers to the requirements regarding care of the animals prior to adoption, and the application sets forth very specific "Terms of Adoption." Paragraph 7 of the Power of Attorney references the signator's primary responsibility to care for the adopted animals in accordance with the terms of the Private Maintenance and Care Agreement and with all applicable laws and regulations. Although the copy of the sample Private Maintenance and Care Agreement included in the record is in part difficult to read, the agreement clearly does specify conditions for possession of the animals, as well as "prohibited acts," in order to ensure humane and proper treatment of the animals. There is, therefore, no question in the mind of the court that the requirement of humane treatment was included as a part of the contractual agreements, signed by the

parties, including the individual applicants and A & B Horse Farms. In the subsequent proceedings in this case, in order to recover, plaintiffs must be prepared to demonstrate that they have not breached the contracts.

The Ninth Circuit Court of Appeals addressed the critical issue of statutory interpretation of 16 U.S.C. §§ 1331–1340 raised by the instant case. In that case, the DOI argued that after the year "probationary" period had passed, the Secretary was entitled to transfer title, even if he knew beforehand that once the adopters received title, they were intending to put the animals to commercial use. The Ninth Circuit Court of Appeals specifically rejected that result. The Ninth Circuit Court reviewed the legislative history, and wrote that such a result would contradict the congressional intent.

> Legislative history thus reveals that Congress intended the one-year wait for title transfer to act as a probationary period that would weed out unfit adopters. The Secretary's disregard for the announced future intentions of adopters undercuts Congress' desire to insure humane treatment for wild horses and burros. In fact, it renders the adoption process a farce, for the one-year requirement of humane treatment and care serves no purposes if on the day the one-year expires, the adopter can proceed to the slaughterhouse with his horses or burros.

*Animal Protection Inst. of Am. v. Hodel,* 860 F.2d at 927.

Likewise, in the Opinion and Order issued on jurisdiction, which dismissed the earlier lawsuit between the same parties, the judge previously assigned the case wrote:

> Specifically, the plaintiff claims that 16 U.S.C. § 1333(c) may be reasonably construed to mean that an adopter who fulfills the statutory requirements is entitled to compensation in the form of title to the adopted horses, or, if title is not conveyed, that the government must provide compensation in money payments.

It is concluded that this construction of 16 U.S.C. § 1333(c) is unreasonable and that the statutory provision is not money-mandating for purposes of Tucker Act jurisdiction. While § 1333(c) gives the Secretary authority to transfer title of adopted horses to private individuals who have complied with the terms of a Private Maintenance and Care Agreement, it by no means mandates that the Secretary automatically transfer title following a one year period. The regulations accompanying 16 U.S.C. § 1333(c) explain that the authorized officer may make available for private maintenance all excess wild horses or burros for which an adoption demand by qualified individuals exists. 43 C.F.R. § 4750.1 (1988). In *Animal Protection Institute v. Hodel,* 671 F.Supp. 695 (D.Nev.1987), *aff'd,* 860 F.2d 920 (9th Cir.1988), the court held that the Secretary must reject a potential adopter as unqualified and refuse to transfer title when it knows in advance that the potential adopter intends to commercially exploit adopted horses and burros after title is transferred.

*Haberman v. United States,* 18 Cl.Ct. 302, 306 (1989).

 This judge also agrees that the proper statutory interpretation of 16 U.S.C. §§ 1331–1340, and regulations issued pursuant thereto, results in a requirement that the Secretary should exercise his discretion prior to final transfer of title to the wild horses and/or burros subject to adoption, so as to ensure that they have received proper care during the probationary period, and that they will continue to receive such care following adoption. Documentation of an intention, evidenced prior to the transfer of title, to use the wild horses and/or burros for commercial purposes is not consistent with the statutory and regulatory mandate.

## CONCLUSION

For the reasons discussed more fully above, the court concludes that the defendant's motion to dismiss the complaint should be DENIED at this time. A status

conference to set future proceedings in the case will be scheduled by separate Order.

IT IS SO ORDERED.