# United States Court of Federal Claims

No. 14-230 C
July 17, 2015

---

**DAVID NASSIF ASSOCIATES
LIQUIDATING TRUST,**

*Plaintiff*,

**v.**

**THE UNITED STATES OF AMERICA,**

*Defendant.*

---

*Robert C. MacKichan, Jr.*, Vedder Price PC, Washington, DC, attorney of record for plaintiff, with Jacob W. Scott.

*Donald E. Kinner* and *Devin A. Wolak*, United States Department of Justice, Commercial Litigation Branch, Civil Division, Washington, DC, for defendant.

## OPINION *and* ORDER

**Block,** *Judge*.

Plaintiff David Nassif Associates Liquidating Trust ("DNA Trust") seeks payment for services rendered by David Nassif Associates ("DNA") on behalf of the United States Office of the Comptroller of the Currency ("OCC"). DNA Trust argues that it is the successor in interest to DNA, and that it is entitled to payment allegedly owed by OCC to DNA under the terms of a lease agreement between OCC and DNA.

On July 28, 2014, defendant moved to dismiss this case for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1) of the Rules of the U.S. Court of Federal Claims ("RCFC"). Defendant alleges that prior to the creation of DNA Trust, DNA had already transferred all of its rights in the lease to a joint venture led by Metropolitan Life Insurance Company ("Purchaser"), under the terms of a novation agreement. Consequently, defendant argues that DNA's attempt to designate DNA Trust as its successor in interest and to transfer its rights in the lease to DNA Trust was ineffective. Defendant concludes that the court lacks subject matter jurisdiction to hear this case because plaintiff lacks privity of contract with OCC.

On September 24, 2014, plaintiff requested that the court hold an oral hearing concerning the motion to dismiss, pursuant to RCFC 12(i) and 7(b).

Before the court are defendant's motion to dismiss and plaintiff's motion for oral argument. For the following reasons, the court grants defendant's motion to dismiss and denies plaintiff's motion for oral argument.

# I. BACKGROUND

For more than 60 years, the David Nassif Company was the parent organization for a wide variety of real estate development and construction projects.[1] One of its subsidiaries, David Nassif Associates, developed the David Nassif Building, which is located on 400 7th Street SW, Washington DC. Compl. ¶¶ 1, 5. DNA, a limited partnership registered in the District of Columbia, owned and operated this building from the late 1960s until December 13, 2012, when it sold the property to Purchaser for $734 million, making it "one of the most expensive single assets to trade hands in the history of the District's commercial real estate market."[2] This building, which was renamed the Constitution Center following the sale, is the largest private office building in the District of Columbia, with over 1.3 million square feet of rentable space.[3] The Constitution Center leases space to a number of government agencies, including the OCC, the Federal Trade Commission, and the Federal Housing Finance Agency ("FHFA").[4]

On February 11, 2011, DNA and OCC entered into lease no. 335-HQ-DC ("the OCC Lease") for the rental and preparation of office space within the Constitution Center. Under the terms of this lease, DNA agreed to provide over 640,000 rentable square feet of space. DNA also agreed to complete certain modifications and enhancements of the rental space, including the installation of access security enhancements (such as a building and elevator access card security system), security guard services, and the design and installation of a distributed antenna system.[5]

Moreover, in addition to the specific enhancements required under the lease, the OCC reserved the right to request "additional security services." Compl. ¶ 5 (referring to ¶ 20(e) of the OCC Lease). Although subject to the lessor's (DNA's) "prior written consent," such consent

---

[1] http://www.constitutioncenterdc.com/ownership.html. *See also* Compl. ¶ 5.

[2] *Id.*; Daniel J. Sernovitz, *MetLife Acquires Constitution Center for $734 Million*, WASHINGTON BUSINESS JOURNAL, Dec. 13, 2012, at http://www.bizjournals.com/washington/breaking_ground/2012/12/metlife-to-acquire-constitution-center.html.

[3] *See* http://www.constitutioncenterdc.com/ownership.html.

[4] *See* Sernovitz, *supra* note 2.

[5] A distributed antenna system is a network of smaller antennas that is installed "to permit clear wireless communication . . . within a building whose location and physical features would otherwise lead to unacceptable interference with wireless signals and connections." Compl. ¶ 35. In the case of the Constitution Center, this entailed installing an array of ceiling-mounted antennas that interface with cellular service providers, as well as the construction of an underground, secure communications room, with equipment connected by secure underground cables directly to the service providers' nearest operation facility. Compl. ¶¶ 35, 38.

was not to be "unreasonably withheld, conditioned, or delayed." *Id.* OCC would be "responsible" for payment of costs associated with any additional security services. *Id.*

On January 31, 2011—about two weeks prior to the execution of the OCC Lease—DNA entered into a separate but similar lease agreement with the Federal Housing Finance Agency. Compl. ¶ 14. Since the security requirements of OCC and FHFA were substantially the same, OCC and FHFA formed a joint security committee to determine what additional security services to request. Compl. ¶ 15. On October 4, 2011, the OCC submitted to DNA a memorandum entitled "OCC/FHFA Common Area Security Requirements," which set forth "the scope of the security upgrades and enhancements [OCC and FHFA] want to the building common space." Compl. ¶ 16.

In this memorandum, the two agencies requested, *inter alia*, the installation of high-end turnstiles and a security desk in each of the two public entrance lobby areas of the building, as well as the construction of a security guard "ready room" in a separate area off of the 7th Street lobby. Compl. ¶ 18. The memorandum also called for the installation of security cameras along the entire perimeter of the building, in the public entrance lobby areas, and the garage, as well as the construction of a mail room and package screening facility. Compl. ¶ 18. After an extended period of negotiations between OCC, FHFA, and DNA, these parties agreed on a revised conceptual design, allowing DNA to proceed with the modifications. Compl. ¶ 19.

But complications arose, beginning in May of 2012, when DNA submitted a memorandum to OCC, informing OCC that DNA had sold the Constitution Center to Purchaser. Compl. ¶ 47. At the time, the construction of the tenant improvements was still roughly eight months from completion. *Id.* Plaintiff's memorandum stated that pursuant to the terms of a purchase and sale agreement[6] between DNA and Purchaser, DNA's managing director, Timothy Jaroch, would be required to "contract with [Purchaser] to direct and superintend the completion of the OCC interiors project, the amenity spaces, and the security spaces/security enhancements." *Id.* On June 7, 2012, at a meeting with OCC and FHFA, DNA reiterated that Mr. Jaroch would continue to be responsible for the completion work after the sale of the Constitution Center. Compl. ¶ 48.

On December 13, 2012, DNA completed the transfer of the Constitution Center to Purchaser. Compl. ¶ 49. On that same day, DNA, Purchaser, and OCC executed a novation agreement, effective December 13, 2012. *Id.*; *see* Novation Agreement, Def.'s Ex. at 174. Pursuant to the terms of the novation agreement, DNA "transferred to [Purchaser] all of its rights in and all of the assets related to the [Constitution Center]" and "waive[d] any claims and rights against the government that it now has or may have in the future in connection with the [lease]." *Id.*; Def.'s Ex. 174-75. Moreover, the parties agreed that Purchaser would "be bound by and . . . perform the [lease] in accordance with the terms and conditions contained in the [lease] . . . [and Purchaser] assumes all obligations and liabilities of, and all claims against, [DNA] under the [lease] as if [Purchaser] were the original party to the [lease]." *Id.*; Def.'s Ex. 174-75. Also, on December 13, 2012, DNA directed OCC, in writing, to submit all future rental payments directly to Purchaser. Def.'s Ex. 191.

---

[6] Although the complaint refers to the purchase and sale agreement between DNA and Purchaser, *see* Compl. ¶ 47, neither party has provided the court a copy of this agreement.

On December 21, 2012—eight days after the execution of the Novation Agreement—DNA assigned all of its assets and liabilities to DNA Trust, pursuant to the terms of an Assignment and Assumption Agreement. *See* App. to Pl's Opp'n to Mot. Dismiss ("Pl.'s Ex."), ECF No. 9, at 10. This trust was apparently created to wind up the affairs of DNA and to avoid a substantial tax that otherwise would have been due to the District of Columbia. Compl. ¶ 5; *See also* Liquidating Trust Agreement, Pl.'s Ex. at 9-10. Timothy Jaroch, the managing general partner of DNA, serves "as the sole trustee of the [DNA] Trust."[7] Liquidating Trust Agreement, Pl.'s Ex., at 9-10.

Following the transfer of the Constitution Center to Purchaser, Mr. Jaroch—formerly the managing general partner of DNA, and now trustee of DNA Trust—"continued to administer and superintend the Completion Work [under the OCC Lease] until May 13," in accordance with the purchase and aale agreement. Compl. ¶¶ 47, 50. According to plaintiff, "DNA and OCC continued to proceed [after December 13, 2012] under the clear understanding that DNA—not the Purchaser—would assure that the Completion Work would be finished." Compl. ¶ 51.

On January 27, 2013, Mr. Jaroch, apparently acting "on behalf of DNA and the [DNA] Trust," notified OCC's contracting officer ("CO") that he would "soon be getting [her] final invoicing from David Nassif Associates for guard services . . . ." Compl. ¶ 52. Mr. Jaroch also informed the CO, in a letter, that he would provide final cost information for the access security enhancements as soon as possible. Mr. Jaroch requested that the CO confirm "that the timing of such invoicing on behalf of DNA will not itself be an impediment to payment." *Id.* Plaintiff has not explained the significance of this "timing." In any event, plaintiff alleges that Mr. Jaroch "expressly reminded" the CO "that the reimbursements due to DNA under the OCC Lease would continue to be owed to the [DNA Trust] on behalf of DNA—not the Purchaser." *Id.* According to plaintiff, "OCC did not respond to the January 27, 2013 letter to dispute that assertion." *Id.*

Mr. Jaroch completed the access security enhancements in April 2013. Compl. ¶ 54. Upon completion, Mr. Jaroch provided representatives of OCC and FHFA with a tour of the facilities, as well as "a detailed spreadsheet and a binder of documents substantiating the costs incurred" in completing the work. *Id.* According to plaintiff, "OCC representatives did not indicate any objection to paying DNA for OCC's pro rata share" of the completion costs. *Id.* Plaintiff emphasizes that "[d]uring the period of Completion Work, OCC did not object to the understanding that it would be liable to DNA for its share of guard services and access security enhancements, and OCC continued to accept DNA's performance." Pl.'s Opp'n, ECF No. 9, at 5.

Additionally, plaintiff avers that "as recently as August 12, 2013," Gregory Griffin, OCC Senior Project Manager for the tenant interiors project, directly informed Mr. Jaroch that he intended to follow up regarding plaintiff's reimbursement: "I completed my analysis [of the binder of cost documentation] and distributed my report to Debbie [VanBuskirk] before I left. I also briefed MetLife. I'll follow up and try to get this moving." Compl. ¶ 54 (citing XXX).

---

[7] The Complaint describes Timothy Jaroch as the "sole trustee." Compl. ¶ 5. Nonetheless, the Assignment and Assumption Agreement lists both Timothy Jaroch and David E. Jenkins as trustees. *See* Liquidating Trust Agreement, Pl.'s Ex. at 12.

On October 4, 2013, plaintiff DNA Trust submitted a certified claim to the OCC's contracting officer for reimbursement costs. On February 10, 2014, the CO issued a final decision denying the claim in full, on the ground that DNA Trust lacks privity of contract with OCC.[8] Compl. ¶¶ 2-4. Plaintiff filed the instant complaint on March 25, 2014. Plaintiff seeks $2,598,398.43 for services rendered to the OCC by plaintiff's purported predecessor-in-interest.

On July 28, 2014, defendant moved to dismiss this case for lack of subject matter jurisdiction. Defendant argues that the Tucker Act's waiver of sovereign immunity for contract claims against the government does not apply because plaintiff lacks privity of contract with the OCC. *See* 28 U.S.C. § 1491(a)(1). Defendant observes that plaintiff was not a party to the lease at the lease's inception, and that by the time DNA attempted to transfer its rights in the lease to DNA Trust, DNA had already transferred its rights to Purchaser under the terms of the Novation Agreement. Defendant also argues that, even if DNA retained some rights in the lease following the Novation Agreement, any attempt to transfer those rights to DNA Trust without the government's consent violates the Assignment of Contracts Act, 41 U.S.C. § 6305(a) (formerly 41 U.S.C. § 15(a)).

Since the filing of the complaint and motion to dismiss, the parties have apparently attempted to settle this case.[9] According to plaintiff, defendant's counsel expressed concern that paying DNA Trust the costs of completion would expose it to liability for a duplicative claim from Purchaser, which under the terms of the Novation Agreement, had purchased all rights in the lease. Pl.'s Opp'n at 3. To address this concern, plaintiff provided defendant's counsel a release of claims on behalf of Purchaser on August 21, 2014. *Id*. at 3-4. The proposed release seeks payment into an escrow account held by Purchaser's property manager of the full amount sought by DNA Trust in exchange for a mutual release of claims between Purchaser and OCC for all claims stemming from the facts of this case. *Id*. at 3-4; Pl.'s Ex. 14-15. Nevertheless, plaintiff alleges that defendant has not provided a response to this proposal. Pl.'s Opp'n at 4.

Finally, on September 24, 2014, plaintiff moved for oral argument concerning the motion to dismiss. Defendant's motion to dismiss and plaintiff's motion for oral argument are ripe for consideration by the court.

## II. APPLICABLE LEGAL STANDARDS

The Court of Federal Claims, like all federal courts, is "a court of limited jurisdiction." *Brown v. United States*, 105 F.3d 621, 623 (Fed. Cir. 1997). The scope of the Court of Federal Claims' jurisdiction to entertain claims and grant relief depends upon the extent to which the United States has waived its sovereign immunity. *United States v. King*, 395 U.S. 1, 4 (1969). In "construing a statute waiving the sovereign immunity of the United States, great care must be taken not to expand liability beyond that which was explicitly consented to by Congress." *Fid. Constr. Co. v. United States*, 700 F.2d 1379, 1387 (Fed. Cir. 1983).

---

[8] Plaintiff has not supplied a copy of the CO's final decision. The court, accordingly, relies on the account provided in the Complaint. *See* Compl. ¶¶ 2-4.

[9] Plaintiff alludes to settlement discussions in its opposition to the motion to dismiss. *See* Pl.'s Opp'n at 3-4. Nonetheless, the court is unclear as to the extent or scope of these discussions.

This court's jurisdictional grant is found primarily in the Tucker Act, which provides the Court of Federal Claims with jurisdiction "to render any judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). Thus by its terms, the Tucker Act's waiver of sovereign immunity in regard to contract claims applies only "to those with whom [the United States] has privity of contract." *Erickson Air Crane Co. v. United States*, 731 F.2d 810, 813 (Fed. Cir.1984); *see also Ester Exp. Lines v. United States*, 739 Fed 689, 693 (Fed. Cir. 2014) ("To maintain a cause of action under the Tucker Act based on a contract, [a plaintiff] must show that there is a contract directly between itself and the Government"); *Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998); *S. Cal. Sav. & Loan Ass'n v. United States*, 422 F.3d 1319, 1328 (Fed. Cir. 2005) ("A plaintiff must be in privity with the United States to have standing to sue the sovereign on a contract claim"). The court notes that this requirement of privity of contract does not preclude successors in interest to the original contractor from maintaining suit in this court, as long as the transfer of rights in a contract is not precluded by statutes such as the Assignment of Contracts Act. *See Carpenter v. United States*, 69 Fed. Cl. 718, 727 (2006) (citing *United Int'l Investigative Servs. v. United States*, 26 Cl. Ct. 892, 897-98 (1992)).

When the court's subject matter jurisdiction to hear a case is challenged, the plaintiff has the burden of establishing that this court has jurisdiction over its claims by a preponderance of the evidence. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *Reynolds v. Army and Air Force Exchange Service*, 846 F.2d 746, 747 (Fed. Cir. 1988). The court "must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (2011) (citing *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995)). "Determination of jurisdiction begins with the complaint." *Holley v. United States*, 124 F.3d 1462, 1465 (Fed. Cir. 1997). Nonetheless, if the factual allegations in the complaint are not sufficient to resolve the jurisdictional dispute, the court may consider relevant evidence beyond the pleadings. *See Fisher v. United States*, 402 F.3d 1167, 1181-83 (Fed. Cir. 2005); *Moyer v. United States*, 190 F.3d 1314, 1318 (Fed. Cir. 1999).

# III. DISCUSSION

In its motion to dismiss, defendant argues that this court lacks jurisdiction because DNA Trust is not in privity of contract with the United States.

> [A]t the inception of the lease, the parties were DNA and the United States. After the transfer of the Constitution Center to Purchaser and the assignment of the lease to Purchaser, the parties to the lease are Purchaser and the United States. The Trust is not connected to the lease at all, and, thus, lacks standing to bring this lawsuit.

Mot. Dismiss at 6.

Additionally, defendant argues that DNA's attempt, on December 21, 2012, to transfer its rights in the lease to plaintiff DNA Trust was ineffective because DNA had already transferred and assigned "all of its rights" in the lease to Purchaser on December 13, 2012, pursuant to the

terms of the Novation Agreement. Mot. Dismiss at 8 (quoting Novation Agreement, Def.'s Ex. at 174; and Compl. ¶ 49). Defendant further argues that any attempt by DNA to transfer its rights in the lease to DNA Trust without the government's consent violates the Assignment of Contracts Act, 41 U.S.C. § 6305(a).

Plaintiff acknowledges that by the plain terms of the Novation Agreement, DNA "transferred to [Purchaser] all of its rights in and all of the assets related to the [Constitution Center]" and "waive[d] any claims and rights against the government that it now has or may have in the future in connection with the [lease]." Compl ¶ 49; Pl.'s Opp'n at 5; *see* Novation Agreement, Def.'s Ex. 174-75. Nonetheless, plaintiff alleges that DNA and OCC had an "understanding" that OCC would directly reimburse DNA (or presumably, DNA Trust)[10] for the completion work:

> Although DNA executed the Novation Agreement, purporting to waive all of its claims against OCC, OCC continued over the succeeding months to acknowledge responsibility to pay for the goods and services for its benefit. DNA relied on OCC's assurances, both before and after execution of the Novation Agreement, that OCC would meet those responsibilities.

Compl. ¶ 57; *see also* Pl.'s Opp'n at 3 ("OCC did not object to the understanding that it would be liable to DNA").

The court finds plaintiff's legal theory difficult to follow. Plaintiff argues that despite the "formalities" of the Novation Agreement, plaintiff had "an understanding" with OCC. Pl.'s Opp'n at 5. The Tucker Act, however, does not employ the word "understanding" but requires evidence of an actual "express or implied contract" between plaintiff and the United States in order for this court to have jurisdiction over a plaintiff's claim. 28 U.S.C. § 1491(a)(1). Plaintiff does not allege the existence of an express contract between plaintiff and defendant requiring defendant to compensate plaintiff directly for the completion work. Therefore, to overcome the motion to dismiss before the court, plaintiff must show, by preponderant evidence, the existence of an "implied-in-fact" contractual relationship between DNA Trust and OCC.

The court finds, for the following reasons, that plaintiff has failed make this showing. Additionally, the court finds that even if such an implied-in-fact contract existed, the court would be precluded from enforcing it due to the existence of a conflicting, express contract concerning the same subject matter.

**A. Plaintiff Fails To Show the Existence of an Implied-in-fact Contractual Relationship with OCC**

The requirements for establishing an implied-in-fact contract and an express contract are identical: in either case, a plaintiff must demonstrate: "(1) mutuality of intent to contract, (2) consideration, (3) an unambiguous offer and acceptance, and (4) 'actual authority' on the part of

---

[10] As explained above, DNA dissolved itself on December 21, 2012, and purportedly assigned all of its assets to DNA Trust on that very day. *See* Liquidating Trust Agreement, ¶ F, ECF No. 9, at 2 and Assignment and Assumption Agreement, ECF No. 9 at 10.

the government's representative to bind the government." *Schism v. United States*, 316 F.3d 1259, 1278 (Fed. Cir. 2002). The distinguishing characteristic of an implied-in-fact contract is the form of proof—the existence and terms of an implied-in-fact contract are inferred from the conduct of the parties, instead of being explicitly set forth in an instrument:

> A contract implied in fact requires a showing of the same mutual intent to contract as that required for an express contract. The fact that an instrument was not executed is not essential to consummation of the agreement. It is essential however, that the acceptance of the offer be manifested by conduct that indicates assent to the proposed bargain. The requirements of mutuality of intent and the lack of ambiguity in offer and acceptance are the same for an implied-in-fact contract as for an express contract; only the nature of the evidence differs.

*Russell Corp. v. United States*, 537 F.2d 474, 482 (Ct. Cl. 1976); *see also Maher v. United States*, 314 F.3d 600, 606 (Fed. Cir. 2002) (internal quotations omitted) (the existence of an implied-in-fact contract is "inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances"); *City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed. Cir. 1998).

As explained above, plaintiff need not present exhaustive evidence of an express or implied-in-fact contract at this stage of the proceedings; at the pre-answer stage, "[a] well-pleaded allegation in the complaint is sufficient to overcome challenges to jurisdiction." *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997). But plaintiff does not even mention, let alone discuss, any of the elements required to allege an implied-in-fact contract. Plaintiff presents no evidence of any inducement on the part of the government or any negotiation between plaintiff and defendant for the court to weigh against the plain language of the Novation Agreement. Plaintiff similarly presents no evidence of authority to contract—in fact, the court cannot discern from the pleadings which government official was involved in the purported understanding between plaintiff and OCC.

Instead, plaintiff simply alleges that it had an "understanding" with OCC that OCC would compensate plaintiff for the completion work rather than Purchaser. As evidence of this understanding, plaintiff points out that OCC continued to accept the completion of both the access security enhancements and OCC's distributed antenna system runout, even after the Novation Agreement. Compl. ¶ 57. Plaintiff also notes that OCC did not initially object when informed by Mr. Jaroch on January 27, 2013, that OCC would "soon be getting final invoicing from David Nassif Associates for guard services," as well as cost information for the access security enhancements. Compl. ¶ 52. In fact, Mr. Jaroch invoiced OCC directly in April 2013. Compl. ¶ 54. Plaintiff also notes that as recently as August 2013, the OCC Senior Project Manager informed Mr. Jaroch that he had analyzed the cost documentation and would "follow up and try to get this moving." *Id*. Plaintiff concludes that notwithstanding the express terms of the Novation Agreement, "DNA and OCC . . . behaved as if the two were in direct privity of contract." Pl.'s Opp'n at 5. According to plaintiff, "OCC's actions can be interpreted as nothing except consent to the assignment of the Completion Work to DNA, despite the existence of the Novation Agreement." *Id.* at 9.

The court finds that although some of these facts may appear peculiar, the OCC's actions do not amount to a well-pleaded allegation of a contract implied-in-fact. In the first place, it is hardly remarkable that OCC continued to accept performance of the completion work without compensating plaintiff directly. As explained above, in May 2012, DNA informed OCC that the purchase and sale agreement between DNA and Purchaser required Mr. Jaroch to "direct and supervise the completion of the OCC interiors project, the amenity spaces, and the security [enhancements]" after the transfer of ownership of the Constitution Center from DNA to Purchaser. Compl. ¶ 47. In light of this information, it would have been reasonable for OCC to assume that DNA had arranged to obtain compensation from Purchaser rather than OCC. The OCC's acceptance of performance without payment of compensation to DNA Trust is also consistent with the Novation Agreement, which expressly states that DNA shall transfer all of its rights under the OCC Lease to Purchaser, and with DNA's instruction to OCC to remit all future rent payments to Purchaser.

As for defendant's failure to promptly correct DNA's impression that it would receive compensation from OCC rather than DNA, the court cannot find that this in and of itself suggests the existence of an implied-in-fact contract. As explained above, an implied-in-fact contract requires evidence of mutuality; unilateral action on the part of contractor does not suffice. *See, e.g.*, *Russell Corp.*, 537 F.2d at 482.

Finally, the court finds the details of plaintiff's alleged understanding remarkably hazy. For instance, it is unclear from plaintiffs' briefs whether this purported understanding emerged before or after the Novation Agreement, whether it was separate or adjunct to the Novation Agreement, or whether it included Purchaser. To add to the confusion, plaintiff appears to treat Mr. Jaroch, DNA, and DNA Trust interchangeably—for instance, plaintiff continues to describe the completion work performed in 2013 and the actions of Mr. Jaroch as being performed by "DNA," notwithstanding plaintiff's allegation that DNA had dissolved itself on December 21, 2012. *See, e.g.*, Compl. ¶¶ 51-58; *c.f.* Liquidating Trust Agreement, ¶ F, ECF No. 9, at 2 and Assignment and Assumption Agreement, ECF No. 9 at 10. This is not merely a formalistic quibble, as the very identity of the party at each stage of the proceeding is essential to determining whether privity of contract exists between DNA Trust and the OCC.

For the foregoing reasons, the court finds that plaintiff has not met its burden of alleging facts that show by a preponderance of the evidence that an implied-in-fact contract arose between plaintiff and OCC.

**B. The Existence of an Express Contract Precludes the Existence of an Implied-in-fact Contract Concerning the Same Subject Matter**

In any event, plaintiff's reliance on the existence of an informal "understanding" is futile because it conflicts with the express language of the Novation Agreement. "It is well settled that the existence of an express contract precludes the existence of an implied-in-fact contract dealing with the same subject matter, unless the implied contract is entirely unrelated to the express contract." *Schism v. United States,* 316 F.3d 1259, 1278 (Fed. Cir. 2002); *see also Bank of Guam v. United States*, 578 F.3d 1318, 1329 (Fed. Cir. 2009); *Atlas Corp. v. United States,* 895 F.2d 745, 754–55 (Fed. Cir. 1990). The Novation Agreement covers the rights and obligations

of OCC, DNA, and Purchaser in regard to the OCC Lease. The Novation Agreement explicitly states that all of DNA's rights and liabilities under the OCC transfer directly to Purchaser on December 13, 2012. Accordingly, the court rejects plaintiff's attempt to subvert the plain language of the Novation Agreement by vaguely adumbrating the existence of some "understanding," which on its own terms, does not amount to an implied-in-fact contract, for the reasons explained above.

Additionally, the court notes that plaintiff's reliance on an informal understanding is also contrary to the parol evidence rule: "barring certain limited exceptions (*e.g.,* fraud), a party to a written contract cannot supplement or interpret that agreement with oral or parol statements that conflict with, supplant, or controvert the language of the written agreement itself." *Bank of Guam*, 578 F.3d at 1329 (holding that plaintiffs' implied-in-fact contract claim "is foreclosed because an 'implied-in-fact contract cannot exist if an express contract already covers the same subject matter'") (quoting *Trauma Serv. Gr'p v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997)).

In short, the court finds that the rules of contract interpretation and the parol evidence rule provide an additional ground for granting defendant's motion to dismiss.

## C. The Court Denies Plaintiff's Motion for Oral Argument

On September 24, 2014, plaintiff requested the court for oral argument "to provide the parties an opportunity to be fully heard on their positions." Plaintiff files this motion pursuant to RCFC 12(i), which states the following:

> If a party so moves, any defense listed in RCFC 12(b)(1)-(7)--whether made in a pleading or by motion--and a motion under RCFC 12(c) must be heard and decided before trial unless the court orders a deferral until trial.

RCFC 12(i) "does not guarantee a right to present oral argument, but only that a party be provided the opportunity to present its views." *Gallo-Rodriguez v. United States*, 513 F. App'x 971, 973-74 (Fed. Cir. 2013), reh'g denied (May 29, 2013).

The court finds that plaintiff has had ample opportunity to present its arguments in its complaint and in its response to defendant's motion to dismiss. The court, in its discretion, denies plaintiff's motion for oral argument.

\* \* \* \* \*

Plaintiff characterizes defendant's jurisdictional argument as "nothing more than a formalistic approach to avoiding liability for millions of dollars of benefits conferred upon OCC that it has continued to enjoy without paying even a dollar to any party." Pl.'s Opp'n at 7. In fact, in light of the proposed release presented by plaintiff to OCC, it appears that there may indeed have been some confusion or misunderstanding among the parties regarding payment for the completion work. As defendant points out, plaintiff "may be entitled, downstream, to portions of payments due to Purchaser for work performed by [DNA]." Def.'s Reply, ECF No.

10, at 2. Indeed, this would be consistent with plaintiff's allegation of an agreement between Purchaser and DNA. *See* Compl. ¶ 47 (discussing one of the terms of the Purchase & Sale Agreement).

In any event, the issue before the court is not whether plaintiff is entitled, in the abstract, to compensation for the completion work, but whether this court has jurisdiction to consider plaintiff's claim in the first place. As explained above, the Court of Federal Claims, like any other federal court, may adjudicate claims against the United States *only* with the United States' consent. *Transamerica Ins. Co. v. United States*, 31 Fed. Cl. 602, 604 (1994) ("Absent congressional consent to adjudicate a claim against the United States, [the CFC] lacks authority to grant relief."). "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is the power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868).

In conclusion, the court finds that plaintiff has failed to show privity of contract with defendant, and accordingly finds that the court has no jurisdiction to hear this case. In light of this finding, the court need not consider defendant's argument that DNA's purported transfer of its rights under OCC Contract to DNA Trust is precluded by the Assignment of Contracts Act.

## III. CONCLUSION

For the reasons set forth above, defendant's MOTION to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1) is GRANTED, and plaintiff's MOTION for oral argument pursuant to RCFC 12(i) is DENIED. The Clerk is directed to take the necessary steps to dismiss this matter.

**IT IS SO ORDERED.**

*s/ Lawrence J. Block*
Lawrence J. Block
Judge